**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
CORALISA LEWIS               :    Civ. No. 3:21CV00529(SALM)
                             :
v.                           :
                             :
FIRST UNUM LIFE INSURANCE    :
COMPANY OF AMERICA           :
                             :    March 29, 2023
-----------------------------x
```

## MEMORANDUM OF DECISION

Plaintiff Coralisa Lewis ("plaintiff" or "Lewis") has brought this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132. See Doc. #1 at 3. Plaintiff seeks judicial review of the denial by First Unum Life Insurance Company of America ("Unum" or "defendant") of her claim for disability benefits under a group plan in which plaintiff participated. See id. at 2.

Each party filed a motion for summary judgment [Docs. #35, #36] and an opposition to the opposing party's motion for summary judgment [Docs. #47, #49]. Each party also filed a statement of material facts and responses thereto [Docs. #35-2, #36-2, #48, #50], and a reply brief [Docs. #58, #59]. The parties agreed to a bench trial on a stipulated record and the written briefing pursuant to Rule 52 of the Federal Rules of Civil Procedure. See Docs. #53, #55.

The Court conducted a bench trial on August 11, 2022. See

1

Doc. #60. At trial, counsel confirmed that their clients consented to a bench trial on the written submissions and waived the right to call witnesses. See Doc. #55; see also O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir. 2011). During the bench trial the Court raised the question of how the Social Security award might be relevant, and specifically the impact, if any, of the bases of that award. The Court permitted the parties to file supplemental briefing on that issue. On September 8, 2022, plaintiff filed a supplemental brief. See Doc. #63.

Upon consideration of the parties' written briefing, the stipulated record [Doc. #32], and the oral arguments of counsel, the Court **AFFIRMS** defendant's decision that no further benefits were payable to plaintiff under the Plan.

I.   <u>**FINDINGS OF FACT**</u>

The following findings of fact are based upon the stipulated record. [Doc. #32].[1]

A.   **Administrative Background and Policy**

Plaintiff was employed by Memorial Sloan Kettering Cancer Center as a Clinical Nurse III. See AR2642. Unum issued to Sloan Kettering "group insurance policy no. 456533 003 (the 'Policy') that insured benefits payable under the Memorial Sloan Kettering

---

[1] The Court cites to the Bates numbering as reflected in the administrative record. See Doc. #32.

Cancer Center Plan (the 'Plan')." Doc. #48 at 1.[2] The Plan,
governed by ERISA, covered Sloan Kettering employees, including
plaintiff. See AR203, 214.

Unum's Long Term Disability ("LTD") Plan as applied to
plaintiff states:

> You are disabled when Unum determines that:
> - you are limited from performing the material and
> substantial duties of your regular occupation due to
> your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly
> earnings due to the same sickness or injury.

AR219 (emphases omitted).

The Plan limits "[d]isabilities due to mental illness" to a
"pay period up to 24 months." AR226. The Plan defines mental
illness as

> a psychiatric or psychological condition regardless of
> cause such as schizophrenia, depression, manic
> depressive or bipolar illness, anxiety, personality
> disorders and/or adjustment disorders or other
> conditions. These conditions are usually treated by a
> mental health provider or other qualified provider using
> psychotherapy, psychotropic drugs, or other similar
> methods of treatment.

AR237. The Plan grants Unum "discretionary authority to make
benefit determinations under the Plan." AR246. "Benefit
determinations include determining eligibility for benefits and
the amount of any benefits, resolving factual disputes, and

---

[2] Docket #48 is plaintiff's Local Rule 56(a)(2) Response to
Defendant's Statement of Undisputed Material Facts. See Doc. #48
at 1.

interpreting and enforcing the provisions of the Plan." AR246.

**B.   Brief Summary of the Relevant Medical History**

The relevant medical history reflects plaintiff's self-reported injuries and symptoms, as well as certain clinical findings.

On July 5, 2014, plaintiff sought treatment in the emergency room for a "[c]losed head injury with concussion" that occurred on July 4, 2014. AR364. Plaintiff reported a "feeling of mild nausea, neck stiffness, 'weird' vision, and pressure behind her right eye." AR362.

Plaintiff reported that on July 25, 2014, she was in bed and heard a "buzzing noise in her head and blacked out for (what she believes) was just a few seconds." AR322. When the episode was over "she was in the same exact position[.]" Id. Plaintiff reported that in "August of 2016 she had another head injury when a frame and a book came off a shelf striking her in the head." AR123. Plaintiff reported that in "July of 2017 she was getting out of an Adirondak chair, and fell into the chair and striking her 'head again in a mild way'." AR124 (sic).

The administrative record reflects that plaintiff stopped working on July 5, 2017. See AR11. The record indicates that Lewis returned to work full-time for approximately two months in early 2018. See AR11-12. Plaintiff sought medical attention on February 28, 2018, reporting that she had suffered another head

4

impact on or about February 21, 2018, when she was putting the top down on her car. See AR132. Plaintiff did not return to work full-time after that incident, and her LTD "benefits started on February 26, 2018." AR2583; see also AR11-12.

### C.  Application History

On March 8, 2018, Unum received plaintiff's application for LTD benefits. See AR2. Plaintiff's claim for LTD benefits was initially denied on May 22, 2018, because it was determined that plaintiff was "able to perform the duties of [her] occupation." AR624. On November 17, 2018, plaintiff, through her attorney, administratively appealed Unum's determination. See AR648-57. The appeal argued that

> Ms. Lewis had demonstrated that she is disabled from performing her position as a hospital nurse as a result [of] her vision and cognitive issues. As mentioned above, we believe her psychological condition has contributed to her disabilities, and we will supply information in support of that aspect of her impairments within the next thirty-days.

AR657. On February 4, 2019, plaintiff supplemented her appeal with a "Notice of Award" of Social Security Disability Insurance ("SSDI") dated February 1, 2019. AR984; see also AR982-89. The SSDI award was based on a primary diagnosis code of 2940 (Neurocognitive Disorders) and a secondary diagnosis code of 2960 (Depression, Bipolar and Related Disorders). See AR1059; see also AR1620.

Unum reviewed plaintiff's appeal and reversed its decision,

granting plaintiff benefits. The "Appeal Reversal Form" stated:

> The Unum claim does not contain compelling evidence to demonstrate that the SSDI award of disability is inconsistent with the medical evidence. Therefore, based on our review, the claim should be approved.
>
> The information supports that the mental illness limitation applies: SSDI secondary diagnosis of affective/mood disorder, along with NP report opining diagnoses of depressive disorder and PTSD. NP evaluator said EE's behavioral health struggles have had a debilitating impact on her daily life.

AR1601, 1602 (capitalization altered). Unum sent a letter to plaintiff's attorney, stating:

> At this time, we have determined your client is eligible for benefits under the terms and conditions of the applicable policy.
>
> In the neuropsychological report, the evaluator stated that your client's significant anxiety has had a debilitating impact on her daily life. The Social Security Administration's award of benefits includes a diagnosis of affective/mood disorder.
>
> We have determined on appeal that the information supports your client's behavioral health condition is in part due to mental illness. Disabilities due to mental illness have a limited pay period up to 24 months under the Unum policy. This 24-month period would run from February 26, 2018 through February 25, 2020.

AR1604.

Plaintiff received benefits under the Plan until May 25, 2020, when Unum terminated the benefits. See AR2582. On June 5, 2020, Unum sent Lewis a letter that explained how Unum had reached its decision:

> We approved your claim for benefits having received additional information including an award for Social

Security Disability and a neuropsychological evaluation in which you reported anxiety and depression.

Your policy has a limitation for disabilities due to a mental illness. Based on the information we have on file, you are limited to a maximum of 24 months of benefits. Your benefits started on February 26, 2018. You have reached the maximum duration for mental health conditions for on February 25, 2020. Because your claim is subject to this limitation, and we have determined that you do not have a non-limited condition that precludes you from working in your occupation, and we have now provided 24 months of benefits, we will stop paying benefits on your claim.

As you have received the maximum benefit for mental health conditions, we reviewed your file to determine whether a non-limited condition reasonably prevents you from performing the material and substantial demands of your regular occupation as performed in the national economy[.]

...

In conclusion, you have received the maximum duration for benefits under the mental illness limitation. We have determined that you are not precluded from performing the material duties of your regular occupation as outlined above on a full-time basis due to a non-limited condition(s).

AR2583-85 (sic).[3]

By letter dated December 6, 2020, Lewis administratively appealed the termination of benefits, arguing that her "visual and cognitive impairments resulting from PCS [post-concussive syndrome] are physical conditions that prevent her from performing the essential duties of her occupation ... [and] are

---

[3] Unum paid plaintiff "under Reservations of Rights" from February 26, 2020, until the termination of benefits. AR2583.

due to her PCS and not due to any mental illness." AR2908.

On February 11, 2021, Unum upheld its decision to terminate

benefits. Unum sent plaintiff a letter explaining its decision:

> We concluded Ms. Lewis is no longer eligible for
> benefits. She has received the maximum benefits allowed
> under the terms of the policy for disabilities due to
> mental illness. Excluding mental illness, the medical
> information does not support that, as of May 26, 2020
> and ongoing, Ms. Lewis is impaired from performing the
> activities [of her regular occupation] on a full-time
> basis.

AR4629. On April 16, 2021, Lewis filed the instant action. See

Doc. #1.

### D.   Diagnosis and Initial Treatment

Lewis contends that she is disabled by a constellation of

symptoms and disorders caused by repeated concussions. Post-

concussion syndrome ("PCS")

> impacts the ability of neurons/brain cells to signal for
> the right amount of blood to accomplish certain
> processes but does not cause structural degradation to
> the cells themselves. Axonal injury is the shearing or
> tearing of the brain's nerve fibers/axons as the brain
> shifts and is rotated inside the bony surface of the
> skull, such as when the head is struck against another
> object. ... Symptoms of mild traumatic brain injury
> often emerge shortly after the injury and may persist
> for months or even years.

AR3839.

Plaintiff's first reported head injury occurred on July 4,

2014, after which she went to the Norwalk Hospital Emergency

Room for a "[c]losed head injury with concussion[.]" AR370.

Since then, Lewis has received treatment from a number of

specialists.

> **E.   Plaintiff's Treating Physician Opinions &
> Plaintiff's Other Medical Evidence**

The record includes opinions and treatment records from numerous medical providers. This evidence is summarized below.

> 1.   Norwalk Hospital Emergency Room

Plaintiff went to Norwalk Hospital Emergency Room on July 5, 2014, where she was treated by Dr. Arthur Strichman. See AR362. Plaintiff reported that she had injured her head on July 4, 2014. See id.

Emergency Room records signed by Dr. Strichman state that plaintiff presented with "occipital head pain and neck stiffness." Id. Plaintiff reported that "she hit the back of her head on the car's frame as she entered the vehicle." Id. Plaintiff's "pain did not diminish and began to radiate around the right side of her head." Id. She also had "mild nausea, neck stiffness, 'weird' vision, and pressure behind her right eye." Id. Dr. Strichman reported that his "exam was unremarkable except for tenderness of the right posterior occipital area of her skull." AR364.

Dr. Strichman ordered a CT scan of plaintiff's brain, which "revealed no acute abnormality." Id. Plaintiff was discharged with a recommendation "to restrict her physical activity[,] to use ice to the posterior occipital area and use Tylenol for

9

pain[,]" and to "followup with her primary care physician if no improvement in a few days time." Id. (sic).

       2.  Dr. Nitin Sethi

Plaintiff saw Dr. Sethi, a neurologist, for an "initial neurological consultation[]" on July 30, 2014. AR320. Plaintiff reported that on July 4, 2014, she "was getting into her car (buttocks first) and in the process struck the back of her head against the car roof." Id. Plaintiff reported that she "sle[pt] a lot the next 3 days and continued to experience pressure in her head." Id. On July 9, 2014, "the foggy feeling disappeared and her affect was normal." Id. Lewis reported that she returned to work on July 14, 2014, and "felt fine that weekend[.]" Id. On July 21, 2014, "when she went to work she had double work load. Her symptoms reappeared and got worse after she consumed champagne later that week." Id.

Plaintiff reported that she continued to have "neck stiffness, pressure in the head, burning sensation in nose and eyes, she was unable to read or watch TV for prolonged length of time and was also emotionally labile." Id.

The treatment records of Dr. Sethi's July 30, 2014, examination report "[m]ultiple errors on Balance Error Scoring System in the single leg stance and tandem leg stance. No errors on double leg stance." AR322. The treatment record states:

Lewis suffered what sounds like a mild grade of closed

head trauma/concussion on 07/04/2014. She felt fine and
returned to work but currently is plagued with post
concussion symptoms. Her neurological examination is
non-focal which is reassuring.

...

[S]he is advised rest both physical and cognitive till
all her symptoms (headache, pressure, nausea, emotional
lability, balance problems) have resolved. After that a
graded return to work and leisure sports/activities can
begin.

Id. (sic).

On August 13, 2014, Dr. Sethi wrote a letter stating that

he "spoke with Ms. Coralisa Lewis on Monday, 8/11/2014

confirming the persistence of symptoms and the need for more

recovery time. Shall keep under observation, but until then

patient not well enough to return back to work until 9/2/14."

AR324 (sic). The administrative record contains no evidence that

plaintiff saw Dr. Sethi again.

### 3.   Dr. Thomas Toothaker

On August 26, 2014, plaintiff saw Dr. Toothaker, a

specialist in neurology, for a "[c]onsult for [c]oncussion[.]"

AR330. Lewis reported to Dr. Toothaker that she had "bump[ed]

her head against the roof of a taxi last Thursday." AR332. Lewis

reported that this "caused a resurgence of her symptoms. She has

been spending most of the time in bed, in a dark room and has

been feeling depressed lately." Id. Lewis reported "feeling as

if she is in a fog most of the time. Activity, particularly

11

anything that involves screens causes headaches. She has light sensitivity." <u>Id.</u>

Dr. Toothaker's treatment notes report that plaintiff's "tandem gait test showed no abnormalities" and "her neurological examination is normal." AR332. Dr. Toothaker advised Lewis to "continue to rest at home, out of work. She is to avoid screens or anything that may worsen her symptoms." <u>Id.</u>

On September 15, 2014, Dr. Toothaker provided information in response to Unum's request for plaintiff's "current restrictions and limitations." AR327. Dr. Toothaker wrote that plaintiff's anticipated return to work date was September 29, 2014, at which time plaintiff could return to work "2 days per week (10 hour shifts)[.]" AR328. Dr. Toothaker indicated that plaintiff "may need rest periods if [she] develops increased concussion symptoms[,] otherwise no specific limitations[.]" <u>Id.</u>

Lewis saw Dr. Toothaker again on September 23, 2014, and reported that she "can't drive" and "can't walk at a fast pace, feels that her head is still sensitive because if she makes sudden movements or loud sound feels 'jolt'[.]" AR340 (sic). The "Review of systems" for this visit documents plaintiff's "[a]nxiety, depression, and sleep disturbances." AR341. The treatment records state:

> [Lewis] continues to be symptomatic from her concussion with some very minimal improvement. Her CNS Vitals testing was low across the board other than verbal memory

12

> scores. She declines to be on medication [] if it is not
> going to heal her brain from the concussion and only
> help symptomatically. We will retest CNS Vitals in 10-
> 14 days.

AR342.

On October 1, 2014, Dr. Toothaker responded to an inquiry

from Unum seeking plaintiff's "restrictions and limitations" and

"current treatment plan[.]" AR336-38. Dr. Toothaker reported

that Lewis had "[p]ersistent concussion symptoms including

headache, dizziness, [and] fatigue[.]" AR337. Dr. Toothaker set

a tentative return to work date of October 20, 2014, and

continued to limit plaintiff's work to two ten-hour shifts per

week. See id. He opined that plaintiff's "restrictions and

limitations" were not permanent. Id.

The administrative record reflects that Lewis had four

appointments with Dr. Toothaker in four months, then

discontinued treatment with him.

### 4.   Dr. Christopher Gottschalk

Lewis was evaluated by Dr. Gottschalk, a specialist in

neurology, on January 7, 2015. See AR398. The visit notes state:

"[S]ince [Lewis'] initial consult 12/4/2014 she reports doing

poorly after a period of improvement[.]" AR399. The

administrative record does not contain any records from a

December 4, 2014, visit.

On January 7, 2015, plaintiff reported:

13

> By the end of the week of 12/8, she was feeling 'good' and that she was ready to return to work, scheduled for 12/15. Unfortunately, her husband chose to announce on 12/13 that he wants a divorce. This news 'completely floored me' and by a few days later she was suffering significant worsening of symptoms -- nauseated, dizzy, ataxic, 'foggy-headed' -- in addition to being tearful, exhausted, and having trouble concentrating. She stopped working the following week and has had gradual improvement in symptoms, but with intermittent days of increased symptoms.

Id.

Dr. Gottschalk diagnosed plaintiff with "[p]ost concussive syndrome" and noted that "[m]ajor life stressors ... are well-established as factors that lead to worsening and persistence of many disorders, including prolonged post-concussive disorder." Id. Under "Plan" the treatment notes indicate: "[Lewis] is scheduled to meet with a therapist tomorrow, and I underscored the need to address structured relaxation techniques, CBT, stress management skills. She should also engage in gradual return to regular exercise." Id.

The administrative record contains no evidence indicating that plaintiff saw Dr. Gottschalk again.

### 5.   Dr. Stanley Rosner, Ph.D., ABPP, ABPN

Plaintiff began seeing Dr. Rosner at the Counseling and Psychotherapy Group on January 18, 2015. See AR403. On February 17, 2015, Dr. Rosner responded to Unum's request for information with a letter. See AR402-04. Dr. Rosner reported that he had conducted only four sessions with Lewis since January 18, 2015,

14

"largely because of the weather and illness." AR403. Dr. Rosner
wrote:

> She entered therapy because she felt a need for support
> during her recuperative period from a brain concussion
> which is the latest of several accidents she has had
> over the years. She is fearful of putting herself under
> strain for fear of relapse. Most recently, she was
> jostled while getting out of a taxicab and hit her head
> on the door. Since this occurrence, she has experienced
> problem with vision, fatigue, distractibility, and
> mistrust of herself and her environment. In many ways,
> she suffers from a form of Post-Traumatic Stress
> disorder as well as the prolonged sequallae of brain
> concussion.
>
> She is very conscientious in her nursing and is fearful
> of not being fully alert in doing her job.
>
> In my opinion, Ms. Lewis requires supportive
> psychotherapy in dealing with her concerns about
> returning to work.

AR403-04 (sic).

The administrative record contains no treatment notes from
Dr. Rosner and no additional reports from him.

### 6.   Dr. Adrian Dafcik

On April 29, 2015, Lewis saw Dr. Dafcik, her primary care
physician, for her annual exam. See AR1528. The record of this
visit states: "female with 2 head traumas, has known post-
concussion syndrome, uses support group online." Id. Lewis
reported her symptoms as "mild [headaches] daily[,]"
"intermittent 'foggy brain'" and "severe, debilitating fatigue
since head trauma." Id.

On September 26, 2016, Dr. Dafcik responded to an inquiry

15

from Unum, stating that Lewis should "remain out of work beyond September 19, 2016[.]" AR407. Dr. Dafcik provided three "specific physical and/or cognitive findings" in support of that recommendation: "intermittent front/occipital headaches[,]" inability "to tolerate viewing monitors[,]" and inability "to sort out tasks [and] issues with recalling previous work-related terms." Id. Dr. Dafcik summarized Lewis' current restrictions and limitations as follows: "Avoid viewing monitors[,] [u]nable to drive / will wear helmet in car[,] [c]annot work as a nurse [due] to cognitive dysfunction." AR408. Dr. Dafcik recommended that Lewis work part-time starting November 1, 2016, for "4 hour (part-time) work limit for 1-2 weeks". Id.

On October 20, 2016, Lewis reported to Dr. Dafcik that she was "[h]aving trouble with organizing info, fatigue, less HA. Has difficulty with reading, more since last concussion. Trouble reading monitors." AR412. Dr. Dafcik indicated that plaintiff was "[s]low with serial 7's" and "pauses to respond to simple questions[.]" AR414. Dr. Dafcik noted that he would "clear [Lewis] to work 2X/week for 4-hours[.]" Id.

On February 4, 2017, Lewis reported to Dr. Dafcik that she was "better from last episode, but still having effects from previous concussions. Has nightmares about fear of further concussions. Difficulty with watching screens/ TV's. Has stress at work. Has difficulty with learning new concepts." AR1121. Dr.

16

Dafcik noted that Lewis was "[p]ositive for headaches. Negative for dizziness and light-headedness[,]" and "[n]egative for visual disturbance." AR1125, 1126.

Lewis had an annual exam with Dr. Dafcik on June 7, 2017. See AR3157. The record of that visit lists Lewis' diagnoses as: "Post concussive syndrome[,] Chronic post-traumatic headache[,] Exploding head syndrome[,] Cranial neuralgia[,] Acute stress reaction[,] [and] mTBI (traumatic brain injury)[.]" Id. Lewis was "[n]egative for dizziness, light-headedness and headaches" and "[n]egative for visual disturbance." Id.

Lewis saw Dr. Dafcik on July 11, 2017, for an appointment following "a fall on 7/3[.]" AR57. Lewis reported "neck pain[,]" "dizziness, light-headedness and headaches." Id. Dr. Dafcik noted that Lewis was "[p]ositive for sleep disturbance. The patient is nervous/anxious." Id. Dr. Dafcik recommended that Lewis rest and "avoid excessive stimulation[.]" AR59.

At plaintiff's follow-up appointment on July 25, 2017, she reported nausea with driving, "generalized frontotemporal headaches (increased with activity)[,] [and] severe fatigue/ 'brain fog'." AR53. Dr. Dafcik indicated that Lewis had "difficulty with serial sevens subtraction/ slightly hesitant to answer questions/ sensitive to noise[.]" AR54. Lewis did not report visual disturbance, dizziness, or light-headedness. See AR53. Dr. Dafcik noted that Lewis was "[u]nable to work until

17

further notice" and recommended "[h]ead protection precautions[.]" AR55.

On August 7, 2017, Dr. Dafcik responded to Unum's request for information. See AR63-66. Dr. Dafcik stated that plaintiff's restrictions and limitations were to "[a]void excessive visual stimulation[,] [a]void areas where head trauma could occur[,] [a]void noise[,] "[d]rive only if necessary" and avoid "stimulation / multiple computer screens[.]" AR63. Dr. Dafcik's treatment plan included "neurological monitoring" and conservative treatment "for whiplash injury[.]" AR65. Dr. Dafcik reported Lewis' primary diagnosis as "Concussion Syndrome" and her secondary diagnosis as "Cervical Strain[.]" Id.

Plaintiff had follow-up appointments with Dr. Dafcik approximately every two weeks from August 10, 2017, until October 27, 2017. See AR74, AR80, AR86, AR92, AR98, AR104. The treatment notes indicate that Lewis continued to report symptoms including difficulties with cognition, visual issues, "difficulty with noise[,]" and "trouble reading[.]" AR98.

At a visit to Dr. Dafcik on November 14, 2017, plaintiff reported that she had been in a motor vehicle accident on November 2, 2017. See AR478. Lewis reported that she had a "brain MRI" scheduled for November 22, 2017. Id. Dr. Dafcik's exam of Lewis indicated "[b]ilateral paracervical muscle tenderness and tightness[.]" AR479. Dr. Dafcik noted "[n]o

cognitive deficits at this time[.]" Id. Dr. Dafcik stated that
Lewis was "[c]ognitively ready for gradual return to work part-
time (M/W/F 4-h daily)/ no direct patient care[.]" AR480.

Plaintiff saw Dr. Dafcik on December 7, 2017, and December
14, 2017. See AR473, AR468. Plaintiff reported "[i]ntermittent
dizziness/ headaches" and "delayed but improved cognitive
processing." AR468. On December 14, 2017, Dr. Dafcik cleared
Lewis to return "to work with direct patient contact[.]" AR470.

The administrative record contains a letter from Dr. Dafcik
dated July 2, 2018, summarizing plaintiff's treatment. See
AR1184. Dr. Dafcik indicated that Lewis'

> multiple head traumas, with associated neurological
> manifestations, contributed significantly for Ms. Lewis
> to be unable to work in any full-time capacity. Also,
> quite questionable to effectively function as an
> oncology nurse on a part-time basis.
>
> Her above concussions, have been associated with
> cognitive decline, headaches, dizziness, feel like a
> "zombie" sensations and extreme noise sensitivity. Ms.
> Lewis also would have periodic intractable headaches and
> symptoms consistent with tinnitus.
>
> Ms. Lewis would follow concussion protocol, avoid
> excessive stimulation, and would even wear a helmet
> while driving. She had a difficult time viewing monitors
> due to exacerbating headaches.

AR1184 (sic).

At Lewis' annual exam with Dr. Dafcik on September 5, 2018,
she reported "light-headedness and headaches[]" and "visual
acuity changes[.]" AR1400. Dr. Dafcik indicated that Lewis had

"recurrent concussions (8 x), [and] has severe frontal
sensitivity." Id. In the "Assessment & Plan" section of the
treatment record, Dr. Dafcik noted: "Anxiety disorder [sees]
psychologist every 2-weeks[.]" AR1402.

On November 8, 2018, Lewis reported to Dr. Dafcik that she
"has severe cognitive fatigue/ worsens with physical and
cognitive tasks[.]" AR1446. Lewis reported that she was
"[g]etting neurobiofeedback/ PT 2X/week[] [and] vision therapy
1X/ week." Id.

Unum records indicate that as of October 9, 2019, "Dr.
Adrian Dafcik is no longer on staff[]" at Northeast Medical
Group. AR2356. The administrative record contains no records of
treatment by Dr. Dafcik after November 2018.

7.   Dr. Roslyn Einbinder

Plaintiff had a "neurological evaluation[]" with Dr.
Einbinder on October 24, 2017. AR123. Plaintiff reported
symptoms of

> heavy head/sand bag head since the original 2014 injury.
> This cleared within 2-1/2 years after onset but has
> recurred with each injury, cleared and is now recurred
> again.
>
> This involves the entire head. This is described as a
> pressure/heaviness, and muddy sensation. This is all the
> time, changes in intensity if she does too much mentally
> and/or physically.
>
> She is bed ridden with this as she becomes exhausted,
> confused when it is at its worse. There is no photophobia
> but there is extreme phonophobia with tinnitus. She is

20

bedridden for 1-4 days, and as long as 7 days.

AR124 (sic). Plaintiff told Dr. Einbinder that "she is suicidal when symptoms are bad as she has no quality of life. This has destroyed her marriage and now her []job[.]" Id.

Dr. Einbinder stated:

There is clear post concussive syndrome beginning after her 2014 injury with repeated injuries and continued symptoms.

Her heavy/pressure/sandbag head is likely post traumatic headache which was treated[ ]only tr[an]siently.

There is post traumatic cognitive impairment which has never returned to her baseline. It is difficult to know how much of this may be the result of post traumatic headache out of control.

CT brain reviewed and is normal[.]

However, given the extent of her symptoms she requires: MRI of the brain [and] [a]ggressive neurological treatment beginning with a trial of at first abortive medication for headache/ migraine and then consideration of preventative medication. However, she will not consider Topamax.

AR126-27. Dr. Einbinder reported that she does "not feel [Lewis] is medically able to work now as a result of her neurological symptoms." AR127.

After the October 24, 2017, evaluation Lewis did not seek treatment with Dr. Einbinder who "was out-of-network and 40-minutes away[.]" AR656.

8.   Dr. Audrey Paul

Plaintiff sought treatment from Dr. Paul, who is board

certified in "pediatrics and pediatric emergency medicine[]" and had "run a concussion practice for over ... 3 years[]" when she treated plaintiff. AR663. The administrative record contains evidence that Dr. Paul was affiliated with "GrayMatters" and was also during the relevant time period the Medical Director of "Heads Up Westport Concussion Center LLC[.]" AR184; see also A111-12.

Lewis was first evaluated by Dr. Paul on November 2, 2017, at the Concussion Center at GrayMatters. See AR111-12. Lewis reported

> a history of 5 head injuries, starting in July 2014, each of which resulted in significant fatigue, headaches and general loss of cognitive function.
>
> Repeated gradual returns to work have been confounded by re-injury under relatively mundane circumstances, such as an item falling from a kitchen shelf in August 2016, and bumping her head on a chair in July 2017. These seemingly minor incidents have resulted in the acute re-onset of post-concussive symptoms including neck stiffness, cognitive and physical fatigue, noise sensitivity, tinnitus and difficulties with word-finding and memory.

AR111. As part of the November 2, 2017, evaluation Lewis underwent a Quantitative EEG ("qEEG").[4] See AR111-15. The qEEG

---

[4] In response to a questionnaire that appears to have been provided by plaintiff's counsel, Dr. Paul described a qEEG as "a computerized method for analyzing and quantifying EEG data to distinguish EEG patterns that are outside normal population EEG patterns. qEEG has been shown to correlate with traumatic brain injury, and can be used as a marker for traumatic brain injury." AR664.

report stated that Lewis' "qEEG analyses were deviant from

normal and showed dysregulation" in certain areas of the brain.

AR113. Plaintiff's qEEG showed

> significantly increased amplitudes of slower EEG
> frequencies associated with cognitive idling (alpha,
> between 8 and 10 Hz), and reduced amplitudes in the beta
> EEG band, especially between (12 and 15Hz), associated
> with active cognitive processing[.] ... This pattern of
> EEG slowing is consistent with post-concussive syndrome,
> in which cortical resources are diverted from active
> cognitive processes and re-directed towards healing.

AR113. Dr. Paul reviewed the qEEG results and concluded:

"Findings on [Lewis'] qEEG and her physical examination

corroborate the diagnosis of post-concussion syndrome." AR112.

At her December 19, 2017, appointment Lewis reported to Dr.

Paul that she had

> been doing neurofeedback with Gray Matters as well as
> cervicogenic therapy with Dr. Bender.

> Patient has noticed dramatic improvement in symptoms.
> Now able to go back to work for a full day and travel to
> NYC. Still admits to fatigue after doing full day of
> work but improved relative to before.

AR136 (sic).

Plaintiff next saw Dr. Paul on February 28, 2018. See

AR132. Plaintiff

> present[ed] with re-injury on 2/21/18. No [loss of
> consciousness] or vomiting, complaint of neck pain,
> fatigue, fogginess, eye pain, dizziness. Had been
> receiving neurofeedback and chiropractic care by Dr.
> Bender. Was putting top down on her car and hit in the
> back of her head. Symptomatic the next 2 days with severe
> fatigue and nausea.

Id. At this appointment plaintiff underwent a second qEEG assessment, the results of which were consistent with the November 2, 2017, qEEG report. Compare AR113, with AR139. The February 28, 2018, qEEG report noted that a comparison of plaintiff's "EEG recording to a discriminant database of known concussion victims predicted an active concussion of moderate severity[.]" AR140.

During plaintiff's February 28, 2018, appointment, Dr. Paul reviewed the report of plaintiff's February 28, 2018, qEEG assessment. See AR132. Dr. Paul stated in her treatment note that the qEEG report "show[ed] significant slowing relative to previous qEEG consistent with TBI[.]" Id. Dr. Paul recommended "[n]o train travel with limited driving until cleared" and "[m]odified activities as tolerated with limitations on computer screen viewing to [no] more than 10 minutes[.]" Id. Dr. Paul anticipated that plaintiff would have a "4-5 week course of recovery with return to work anticipated by 4/1/18." Id.

The administrative record contains an undated letter from Dr. Paul, bearing a fax transmittal date of March 1, 2018. See AR184. In this letter, Dr. Paul stated that Lewis

suffered a TBI on 2/21/18 which has resulted in associated cervicogenic and vestibular symptoms. These symptoms have limited her[] ability to perform the following tasks and would severely limit her ability to return to work currently.
1. Very limited computer work – may text but limit phone usage to no more than 15

```
                    minutes
                 2. No driving beyond local distances (within
                    10 miles)
                 3. No train travel
                 4. Avoid crowded, loud areas
                 5. No heavy lifting

            Due to the nature of her concussion, we hope for recovery
            with at least partial resumption of these activities by
            April 1, 2018 contingent on my reevaluation.
```

AR184.

On March 22, 2018, plaintiff visited Dr. Paul, reporting a "reinjury one week ago. Was having chiropractic adjustment and sustained direct head injury during adjustment. Immediately experienced headaches, fogginess, neck pain, cognitive slowing." AR456. Dr. Paul noted that Lewis was set to "begin vestibular and cervicogenic therapy with Eron Friedman at Rehabilitation Associates three times a week[.]" AR457. Dr. Paul deferred the "VOMS exam due to symptom exacerbation." Id.

On April 24, 2018, Lewis reported to Dr. Paul "[p]ersistent headaches, fogginess. Continued balance issues." AR697. Dr. Paul referred Lewis for an "endocrine evaluation" and "vision therapy[.]" AR698.

On July 23, 2018, Lewis reported to Dr. Paul "anxiety regarding career potentials, ability to hold down job, concern regarding final sale of her house. Still has persistent memory issues." AR703 (sic). Dr. Paul recommended plaintiff "follow up with Dr. Mindy [Hersh] for continued cognitive behavioral

therapy[.] Follow up for life coaching for constructive solutions to coping with PCS[.] Continued follow up with Randy Schulman for vision therapy[.]" AR704.

Lewis reported to Dr. Paul on September 6, 2018, that she was "hit on the top of head while moving. Immediately developed localized pain. Following day experienced fogginess, headache, fatigue. Also experiencing depression regarding increased sensitivity to mild head injuries, inability to return to nursing at Sloan Kettering in current state, loss of current home." AR705. Dr. Paul examined Lewis and reported: "Non ataxic gait[,] Headache 8/10 (pressure)[,] Dizziness 6/10[,] Tinnitus 9/10[,] Balance Problems 8/10[.]" AR706.

The administrative record contains a questionnaire, which appears to have been provided by counsel for plaintiff, and completed by Dr. Paul on November 14, 2018. See AR663-67. The questionnaire asked: "What objective evidence exists that Ms. Lewis suffers from post-concussion syndrome?" AR663. Dr. Paul answered:

> On my exam, Ms. Lewis is unable to perform tandem gait, has exercise intolerance on the Buffalo Treadmill Test with symptom provocation. She has significant findings on VOMS exam. She has undergone extensive neuropsychological testing that has demonstrated difficulty with processing and memory.

Id. The questionnaire asked: "What does [the neuropsychological exam] indicate about the diagnosis of post-concussion syndrome,

26

its severity, and [Lewis'] ability to perform her job?" Id. Dr.
Paul answered that plaintiff's "post-concussion syndrome
precludes her from performing nursing duties. In addition, 100%
of charting and medication orders are computer based. Having
oculomotor symptoms exacerbated by computer screen time, prevent
her from effectively performing nursing duties." AR663-64.

The questionnaire asked whether plaintiff's "vision issues
provide objective evidence that she suffers from post-concussion
syndrome? If so, how?" AR664. Dr. Paul answered:

> Please see Dr. Schulman's evaluation. The vestibular
> oculomotor test (VOMS) is routinely used to assess
> concussion. Over 50% of concussed individuals have
> visual abnormalities including nystagmus and convergence
> insufficiency. On VOMS assessment, Ms. Lewis has
> significant nystagmus, difficulties with smooth pursuit
> and symptom provocation.

Id.

On February 11, 2019, Lewis reported to Dr. Paul
"persistent cognitive difficulties, neck pain and tinnitus. Also
now with alopecia, nocturia[.]" AR2702. Dr. Paul observed that
Lewis "occasionally mentions suicid[e] as an option in the
future but currently denies suicidal ideation. She does not want
to pursue taking antidepressants." Id. Dr. Paul found "neck
tenderness at base of skull[,]" "[c]onvergence insufficiency at
greater than 20cm[,]" and "[d]elayed recall multiple errors[.]"
AR2703.

On June 18, 2019, Lewis underwent a third qEEG assessment

at GrayMatters. <u>See</u> AR2692. Plaintiff's

> QEEG assessment from 06/18/2019 shows modest improvement, but continues to show excess amplitudes of resting state EEG in the alpha band. This finding reflects [plaintiff's] ongoing difficulties with cognitive load, executive function and attention; and [plaintiff's] struggle to resume a normal work schedule. In addition, excess amplitudes of faster EEG (high beta) were noted, consistent with headaches and cortical hyper-arousal and low pain threshold.

<u>Id.</u>

> On July 11, 2019, plaintiff reported to Dr. Paul:

> Since last visit in February, patient has had 3 exacerbations most severely worsened by driving at night as well as an episode or benign positional vertigo. Still with persistent headaches, dizziness, and noise sensitivity. Also complains of persistent fatigue, memory loss, poor concentration. Has had follow up at NYU with endocrinologist. Pending formal results of Growth Hormone challenge.

AR2704. Lewis was "unable to complete VOMS due to symptom provocation." AR2705. Lewis was scheduled to have a "Non contrast brain MRI" performed in August. <u>Id.</u> The administrative record contains no evidence of an MRI or results of the "Growth Hormone Challenge from NYU[.]" <u>Id.</u>

On December 9, 2019, Lewis reported to Dr. Paul that "[o]n 11/21/2019 hit head against refrigerator and had to cocoon for 2-3 days." AR2706. Plaintiff reported symptoms consistent with her previous visits. <u>See id.</u> Dr. Paul noted "VOMS - symptom provocation with smooth pursuits, horizontal saccadic movements[]" and "convergence insufficiency is at greater than

28

20cm." AR2707.

On February 10, 2020, Lewis reported to Dr. Paul that she "[s]ustained head injury 1/29/20. [D]eveloped symptoms next day with dizziness, fogginess and headache. Patient cocooned for 4 days." AR2708. Lewis reported

> pressure in front of eyes and ears. Tinnitus has been worsening. Humming at baseline since 2014 is worse. Alternating high frequency ringing. Cannot tolerate screens. Seeing neuropsychologist in Fairfield. Will follow up with Dr. Debroy in Stamford Twin Rinks. Experiencing cognitive fatigue. More head "heaviness" sharp shooting pains with cognitive symptoms. Dizziness – off balance – feels woozy[.]

Id. Lewis' convergence insufficiency was "greater than 20cm[]" and her "affect - frustrated, depressed." AR2709.

The administrative record contains a letter from Dr. Paul dated February 20, 2020. See AR2447. Dr. Paul stated:

> I have evaluated Coralisa Lewis for ongoing post-concussion syndrome associated with severe convergence insufficiency, short term memory loss, processing difficulties, headaches, dizziness and fatigue. At this time, based upon my most recent evaluation, Coralisa is unable to sit for extensive neuropsychologic testing to occur on March 7. Extensive cognitive testing is likely to cause significant symptom exacerbation and result in an even more prolonged recovery.

Id.

Lewis underwent a fourth qEEG assessment at GrayMatters on July 23, 2020. See AR2696. The report of that assessment states:

> Consistent with your increased symptoms, your qEEG assessment from 07/23/2020 shows an increase in alpha, indicating your brain is idling rather than being actively engaged in task-related activities. ...

> As mentioned in previous reports, proportional increases in amplitude of slower EEG and reductions in power in faster EEG frequencies reflect reduced cortical engagement and are frequently seen post-injury. These qEEG findings are associated with a reduced ability to concentrate and issues with executive function.

AR2696.

Dr. Paul wrote a letter dated October 27, 2020, summarizing

plaintiff's treatment:

> Since 2014, she has sustained multiple concussive injuries in 2016, 2017, 2018 and 2020. With subsequent injuries, less severe impacts triggered concussion symptoms - not uncommon in patients with post-concussion syndrome. ...
>
> On today's examination, Coralisa is alert in no distress. She endorses appropriate concern the chronic nature of her condition and lack of obvious resolution. She does not express any feelings consistent with a mood disorder or organic depression. She is currently experiencing headache, light and noise sensitivity, neck pain, fogginess, poor memory and poor concentration. Her physical examination is notable for suboccipital tenderness right worse than left with limited range of neck motion with flexion/extension. She has multiple errors on tandem gait eyes open and closed. On the vestibular ocular examination her convergence is at 25cm. She was unable to fully complete the examination due to significant symptom provocation. Based on her present findings, I recommend that Ms. Lewis pursue cognitive therapy with Dr. Fenske. She should also continue cognitive behavioral therapy with Dr. Hersch as some patients with post concussion syndrome show benefit from CBT.

AR3869-70 (sic).

The administrative record does not contain a medical record

of plaintiff's visit with Dr. Paul on October 27, 2020. The

administrative record contains no evidence that plaintiff was

evaluated at GrayMatters after July 23, 2020.

         9.   <u>Dr. Ira Rashbaum</u>

Plaintiff was evaluated by Dr. Rashbaum, a specialist in Physical Medical Rehabilitation, on April 19, 2018. <u>See</u> AR668-74. Plaintiff reported her history of injuries and symptoms to Dr. Rashbaum. <u>See</u> <u>generally</u> AR668-70. Dr. Rashbaum conducted a "Standardized Assessment of Concussion (SAC)[,]" which indicated that plaintiff's "SAC total score" was "35/50." AR670-71. Dr. Rashbaum diagnosed plaintiff with "Concussion without loss of consciousness, initial encounter[,]" "Post concussion syndrome[,]" "Cognitive and neurobehavioral dysfunction following brain injury" and "Balance problem[.]" AR674. In the "Impression[]" section of the medical record, Dr. Rashbaum noted "Concussion, with prolonged abnormal symptoms[.]" AR673 (capitalization altered).

Dr. Rashbaum recommended "[s]upervised physical therapy program; cognitive evaluation (and treatment, if indicated); social work evaluation (and intervention, if indicated)" and follow-up in two months. AR674. The administrative record contains no evidence indicating that Lewis saw Dr. Rashbaum after the evaluation on April 19, 2018.

        10.   <u>Mr. Eron Friedman, M.S., P.T.</u>

Lewis was evaluated by Mr. Friedman, a Physical Therapist at Rehabilitation Associates, Inc., on March 6, 2018. <u>See</u> AR439-

31

43. Mr. Friedman noted that Lewis

> presents with decreased posture, ROM, flexibility,
> strength, gaze stability, vestibular and balance
> reflexes, ability to use computer screens, work,
> negotiate busy areas, exercise for wellness, participate
> in peer based activities. P[atient] would benefit from
> a course of skilled PT to address the limitations noted
> and facilitate a return to most baseline adl's with
> minimized symptoms.

AR442. The medical record states: "MD Diagnosis: Concussion with

Cervicogenic and vestibular dysfunction." Id.

"Lewis was seen in therapy for 20 visits since the initial

evaluation on 03/06/2018[]" through June 18, 2018. AR741. Lewis

reported stiffness, fatigue, and limited balance. See generally

AR741-67. Mr. Friedman's discharge summary stated: "Reason for

Discharge: Maximum function achieved. No recent changes with

exacerbations." AR741. Lewis met "17/23[]" of the goals and was

given a "[h]ome exercise program." Id.

> 11. Dr. Mindy Hersh, Psy.D.

Plaintiff saw Dr. Hersh, a licensed clinical psychologist,

for thirteen appointments between May 2018 and November 2018.

See AR914-15.

The administrative record contains a letter from Dr. Hersh

dated December 14, 2018:

> [Lewis'] brain injuries are not visible and while there
> are certainly indications to support the existence of
> her mTBI she has had to struggle to "prove" these
> difficulties at every turn. Even her primary diagnosis
> of Post Concussion Syndrome can be challenging to
> substantiate. This has definitely impacted her emotional

> well-being. While a psychological disability is also
> "invisible" there is a clear track record that captures
> her suffering, her losses, the professional decline she
> experienced and eventually her inability to resume her
> position as an oncology nurse.
>
> Aside from the physical difficulties she experiences, I
> feel comfortable substantiating her disability claim
> based on her psychological symptoms. ...
>
> ...
>
> In conclusion, Coralisa can no longer function in her
> role as an oncology nurse because her PTSD symptoms have
> constricted her life so much that she would a) not be a
> reliable employee who could commit to regular work hours
> and b) cannot function in her previous capacity due to
> cognitive impairments, sensitivity to screens and a
> general lack of confidence in safely caring for
> patients.

AR911-913.

The administrative record contains another letter from Dr.

Hersh dated July 30, 2020:

> I have no doubt that Coralisa sincerely wishes to return
> to work, and is in no way a malinger. She has
> consistently attempted to return to work, even in the
> face of her severe impairments. Coralisa is not enjoying
> this incapacitated status and is trying her best to
> recover and make a life for herself despite the painful
> setbacks.
>
> It is my opinion that Coralisa's disability is not due
> to a psychological condition. While it is true that
> Coralisa has many depressive symptoms, these do not fit
> with an organic mood disorder. Additionally, her anxiety
> symptoms do not stem from fears and threats beyond her
> control but rather they are specifically related to the
> symptoms that are so easily activated whenever she has
> a minor head injury. Therefore, I can attest that her
> suffering is due to a physiological condition, which
> does have psychological ramifications and affects her
> over all health.

I do not believe that her condition qualifies as a
somatoform disorder. It may be tempting for clinicians
to categorize physical ailments as a conversion or
somatization disorder when there is no visible or
obvious cause for them. However, in Coralisa's case her
symptoms abate on their own with differing amounts of
time and the onset always follow some type of injury to
the head or strain on her eyes or ears.

AR2656-57 (sic).

There are no treatment or billing records from Dr. Hersh in
the administrative record after the November 27, 2018,
appointment. However, plaintiff reported in a December 17, 2019,
phone call with an Unum employee that she "sees Dr Hersh,
therapist, monthly." AR2365 (sic).

   12.  Dr. Randy Schulman, O.D.

Dr. Schulman was an optometrist at Eye Care Associates PC
with a "Master's Degree in Vision Science" and 27 years in
private practice with "extensive experience in post-concussive
care," at the time she treated plaintiff. AR676. Plaintiff saw
Dr. Schulman for "functional vision evaluations" beginning May
16, 2015. AR1378. Plaintiff originally presented with "visual
symptoms and findings consistent with that found post-concussion
including blurry vision, eye burning, floaters, difficulty
reading, headaches, stiff neck, burning eyes, visual distortion
and light flashes." AR1378.

On April 23, 2018, Lewis reported to Dr. Schulman "blurry
vision, vision [that] never returned to normal after

34

concussion[]" as well as "floaters, difficulty reading (has to skim), [headaches], stiff neck, burning eyes/nose, visual distortions (feels 'off'), [and] light flashes[.]" AR550. Dr. Schulman diagnosed Lewis with "Convergence insufficiency[,]" "Generalized contraction of visual field, bilateral OU[,]" "Myopia OU[,]" and "Postconcussional syndrome[.]" AR553.

The administrative record contains a letter from Dr. Schulman dated May 4, 2018:

> Upon initial exam, I found 20/20 acuity at distance and near with correction. Ocular health was unremarkable. She had good convergence but limited eye teaming skills, limited stereopsis or depth perception, reduced accommodative or focusing skills and very poor oculomotor or eye movement skills. She also exhibited a large midline shift. I prescribed syntonic light therapy and recommended a follow up visit in three months. She returned in April 2017 with similar findings, and I saw her most recently on April 23, 2018.
>
> Upon her most recent visit, I found 20/20 acuity at distance and near with correction. She had good convergence but limited stereopsis or depth perception, reduced accommodative or focusing skills, very poor oculomotor or eye movement skills, very poor binocular skills and very restricted visual fields.
>
> Her visual difficulties are a direct result of her concussion and negatively impact her ability to function and work during the day.

AR573.

On October 29, 2018, Lewis reported to Dr. Schulman that she was "[f]eeling some improvement with vision therapy. Still has headache, can read longer than before." AR1525. Dr. Schulman reported that Lewis' "[c]onvergence range significantly improved

35

from last exam[,]" her constricted visual field had "slightly
improved from last exam[,]" and her "[s]uperior field
constricted more." AR1527.

The record contains a questionnaire, which appears to have
been provided by counsel for plaintiff, and completed by Dr.
Schulman. See AR676-78.[5] Dr. Schulman reported that Lewis
suffered from "Convergence Insufficiency, Oculomotor Dysfunction
including Saccadic Dysfunction and Constricted Visual Fields[.]"
AR676. Dr. Schulman discussed Lewis' diagnosis of Convergence
Insufficiency:

> There was a change [in Lewis' condition between 2015 and
> 2018]. 5/16/15 she had normal NPC though backed away,
> normal vergences and head movement with pursuits and
> saccades. 4/23/18 NPC was mildly receded with discomfort
> and backs away, poor vergences and slow saccades and
> head movement on pursuits.
>
> ...
>
> 5% of the population has [Convergence Insufficiency] and
> hers is moderate in severity.
>
> ...
>
> The tests are objective although there is a subjective
> reporting of discomfort. Her NPC is repeatable and
> reliable although additional vergence tests are
> inconsistent.

AR676-77.

To assess Lewis' visual field restrictions, Dr. Schulman

---

[5] Dr. Schulman did not sign or date the questionnaire. See AR678.
However, each page of this questionnaire bears a fax transmittal
date of November 17, 2018. See AR676-78.

conducted "[f]unctional visual field testing[,]" on "4/23/18 and
10/29/18 and the field was reduced at the subsequent visit[,]"
and "[h]er field is less than 20 degrees." AR677. Dr. Schulman
explained that the "patient self[-]reports when they see it[]"
for the visual field test; but plaintiff's "fields were very
consistent and [the fields] usually are unreliable or
inconsistent" if someone tries "to fake it." Id. Dr. Schulman
answered that "upwards of 90% of those with PCS" have
"convergence or visual field issues[.]" Id.

Dr. Schulman was asked how long Lewis "could use a computer
monitor at any one time, and how long could she use a computer
monitor over the course of an eight-hour work day[.]" Id. Dr.
Schulman answered: "15-20 minutes at a time and up to 4 hours
per day[.]" AR678. Dr. Schulman was asked her medical opinion of
"the etiology of Ms. Lewis's vision issue, including any role
her concussions [have] in causing her vision issues?" Id. Dr.
Schulman answered: "The concussions, including later ones,
caused her vision issues as she did not report problems at her
initial visit 5/6/15 and they are much worse recently." Id.

On November 30, 2019, Lewis reported "that she bumped her
head on Wednesday and since then has been having vestibular
issues. Headaches are still very common for patient. Patient
rates headaches as 2 out of 10." AR2166. Dr. Schulman noted that
Lewis' "[c]onvergence range significantly improved from last

exam[.]" AR2168. Dr. Schulman recommended that Lewis "[r]esume monthly office V[estibular] T[herapy], focus on endurance in binocular skills, divergence > convergence and speed of processing." Id.

The record of plaintiff's June 22, 2020, visit with Dr. Schulman states that Lewis had "[p]ersistent binocular and convergence difficulties." AR2714. The administrative record also contains a letter from Dr. Schulman dated June 22, 2020:

> Upon her most recent visit, Coralisa reported exacerbation of symptoms after screen use and post mild bump to her head. Upon examination, I found 20/20 acuity at distance and near with correction. She had reduced convergence, limited stereopsis or depth perception, reduced accommodative or focusing skills, poor oculomotor or eye movement skills, very poor binocular skills and restricted visual fields.
>
> Her visual difficulties are a direct result of her multiple concussions and negatively impact her ability to function and work during the day. At this time, I recommend updating her contact lenses, practicing a healthy lifestyle and in office vision therapy. I also recommended that she follow up with neurology at this time.

AR2711.

There is no evidence in the administrative record indicating that plaintiff saw Dr. Schulman after the June 22, 2020, visit.

### 13. Dr. Christina Kunec, Psy.D.

On April 30, 2018, plaintiff saw Dr. Kunec, Doctor of Psychology, at the Stamford Health System Concussion Center. See

AR576-79. On this date, plaintiff "was administered the ImPACT neuropsychological screening test and the PCSS." AR578. A report of the test results indicates that plaintiff's "Verbal Memory" and "Reaction Time" were classified as "Impaired" and her "Visual Memory" and "Visual Motor Speed" were classified as "Borderline[.]" Id. Dr. Kunec stated:

> Based on this evaluation, I do believe that Coralisa sustained a cerebral concussion on July 4, 2014. She is reporting initial symptoms indicative of concussion. Unfortunately, it sounds as though her subsequent injuries have only exacerbated symptoms and prolonged her recovery. Neurocognitive data today reveal deficits compared to expected baseline performance, given her academic and developmental history. Likewise, VOMS exam reveals vestibular ocular difficulties.

Id. Dr. Kunec's recommended treatment plan included "walking on a daily basis," "maintain[ing] a regular schedule[,]" and a "referral to Outpatient Rehabilitation ... for cognitive speech evaluation." Id. at 578-79.

The administrative record contains no records indicating that Lewis saw Dr. Kunec after April 30, 2018.

### 14. Dr. Scott Bender, D.C.

From November 2017 until April 2018 plaintiff saw Dr. Bender, a chiropractor at Connecticut Spine and Health Center, almost weekly. See generally AR680-90. Lewis also saw Dr. Bender for three appointments in August 2018. See AR689-90.

Lewis reported a variety of symptoms including tightness and tenderness in the cervical area, headaches, dizziness,

memory issues, and slowed cognition. See generally AR680-690.
Lewis reported to Dr. Bender that her "symptoms are ongoing and
are exacerbated with physical or mental exertion." AR689. Dr.
Bender "recommended a MRI evaluation of the cranio-cervical
region to rule out ligament instability along with the
possibility of Chiari/Cerebellar tonsilar ectopia." Id.

On March 6, 2018, Dr. Bender responded to an inquiry from
Unum seeking plaintiff's restrictions and limitations. See
AR298. Dr. Bender listed plaintiff's restrictions as "[n]o car
travel, train, cognitive and physical rest. No prolonged monitor
use." Id. Dr. Bender stated that Lewis' restrictions started on
November 6, 2017, with an "[e]nd date" of March 5, 2018. Id.

There is no documentation in the administrative record
indicating that Lewis saw Dr. Bender after August 2018.

### 15.   Dr. Laura Gutman, Psy.D.

Plaintiff was referred by Dr. Paul for neuropsychological
testing with Dr. Gutman, a licensed clinical psychologist. See
AR918. Dr. Gutman stated that the "[t]esting was broken down
into six different sessions as Ms. Lewis struggled to remain
vigilant throughout long periods of time." AR920.

Dr. Gutman's summary and recommendations were:

> Cognitive testing reveals a strong vocabulary and good
> verbal abstract reasoning skills. Ms. Lewis demonstrates
> an ability to visually analyze and synthesize
> information and nonverbally problem solve. Her good
> mathematical skills are reflected in her ability to

attend to rote information and mentally perform mathematical equations. In contrast, Ms. Lewis demonstrates significantly reduced processing speed.

Neuropsychological test measures reveal significant reductions in visual planning, organization, and processing of information. These struggles represent a great decline from estimated premorbid levels. While Ms. Lewis continues to be able to attend, learn, and integrate information for later recall, it takes her a greater amount of time to do so and she is not consistently efficient in the manner she does so. Particularly overwhelming for her are both visually based tasks as well as tasks containing less certainty and structure. While Ms. Lewis once prided herself on her ability to take on multiple tasks at one time, these struggles are making it challenging for her to do so.

Emotionally, Ms. Lewis has found it extremely hard to cope with the struggles that followed her initial head injury and have persisted and increased following numerous other injuries. While her emotional state does not minimize the significance of her cognitive struggles, it should be considered when understanding her current state as well as treating her.

AR929.

Dr. Gutman diagnosed Lewis with "Post-Concussion Syndrome[,] Depressive Disorder Not Otherwise Specified[,] [and] Post-Traumatic Stress Disorder[.]" Id. Dr. Gutman noted that "[p]rior to addressing cognitive goals, it is crucial that Ms. Lewis' significant anxiety be addressed. Her struggles have had a debilitating impact on her daily life." Id.

There is no indication in the administrative record that Lewis saw Dr. Gutman for treatment after this neuropsychological testing and assessment.

16.  Dr. Laura Joan Balcer

On September 8, 2020, plaintiff saw Dr. Balcer, a

specialist in neuro-ophthalmology. See AR3803. Lewis reported

> two concussions with subsequent persistent visual
> symptoms and vertigo. She has seen multiple providers
> but not at NYU. She has not been evaluated for the
> persistent symptoms of anxiety and neuropsychological
> sequelae. The patient notes that she has had persistent
> and disabling visual symptoms, including difficulty
> coordinating her eyes and head. These symptoms have been
> evaluated by her optometrist, who has noted that there
> are abnormal pursuit and saccade eye movements and a
> normal eye examination otherwise by the patient's
> report.

AR3803-04. Dr. Balcer's examination of plaintiff revealed:

> Visual acuities were 20/20 in both eyes at distance.
> Visual fields were intact to confrontation. She
> perceived 10/10 Ishihara color plates correctly with
> each eye. Pupils were brisk to light without an afferent
> defect. Ocular ductions were full. Convergence near
> point was 10 cm; this is abnormal and above the 7 cm
> threshold. There was no nystagmus. Saccades and pursuits
> were normal on today's examination.

AR3807. Dr. Balcer concluded:

> Given the prior extensive evaluation, and the findings
> of her optometrist indicating abnormal saccade and
> pursuit eye movements, these signs are best treated by
> evaluation and therapy with an occupational therapist
> for vision and also vestibular physical therapy. The
> patient explained that she has pursued these therapies
> previously, but is open to another trial and
> consultation to see if this will improve her symptoms.
> Explained that, in our experience, multiple courses of
> OT and PT may be required for the therapies to be
> effective. For now, she is disabled by her symptoms and
> the physical examination frequently does not capture the
> underlying abnormalities.

Id. Dr. Balcer referred Lewis to Elizabeth Martori for

occupational therapy. See id., AR3841.

The administrative record contains no indication that Lewis saw Dr. Balcer after the September 8, 2020, visit.

### 17.   Ms. Elizabeth Martori, OT

On October 1, 2020, plaintiff underwent an initial evaluation by Ms. Martori, an Occupational Therapist. See AR3841. On that date, plaintiff reported headaches, fatigue, eye strain, blurred vision, "tinnitus, cognitive changes, [and] eye burning[.]" Id.

Ms. Martori's examination of plaintiff revealed "gross oculomotor skill of pursuits abnormal and saccades abnormal during visual screening." AR3844 (emphases in original). Ms. Martori recommended Lewis attend "12 session(s) 1 times per week for 12 weeks to progress toward long term goals." AR3847. The long term goals included utilizing "screens for up to 30 minutes 3 times a week in preparation for work[,]" "improve efficiency of reading[,]" and "improve convergence to fall at or less than 15 cm to improve visual endurance for near work[.]" AR3846-47.

There is no documentation in the administrative record indicating that Lewis saw Ms. Martori after the October 1, 2020, initial evaluation.

### 18.   Dr. Cheree Fenske, Ph.D.

Lewis underwent a neuropsychological evaluation with Dr. Fenske on September 1, 2020, and September 3, 2020. See AR2668.

Plaintiff's "overall general intellect" was determined to be "in the average/high average range[.]" AR2669. Plaintiff's "[p]sychomotor processing speed" and "[p]rocessing speed and visual attention" were both determined to be "mildly to moderately impaired[.]" AR2671. Lewis' "rapid visual scanning" was determined to be "severely impaired[.]" Id.

Plaintiff scored below average on "tests of executive functioning, categorical word generation or the capacity to rapidly generate words beginning with a specific letter[.]" Id. Plaintiff's "[m]ental flexibility, assessed via the capacity to rapidly sequence alternating numbers and letters, is mildly impaired[.]" AR2672. Plaintiff scored average or above average on all memory tests except the "auditory word list learning task (CVLT) was moderately impaired upon immediate recall[.]" AR2671. "Several measures of embedded validity, such as reliable digit span and verbal memory forced choice (CVLT) were given as they were verbal measures that were not impacted by Ms. Lewis' visual impairment. She passed both of these measures, indicating that the protocol was indeed valid." AR2674.

Dr. Fenske observed that on "a questionnaire to assess attention issues" Lewis' "results indicate[d] that a diagnosis of a clinically significant attention disorder is highly probable, with elevations on the activation, attention, and memory subscales." AR2672. "Lewis's Personality Assessment

44

Inventory clinical profile revealed an elevation on the somatic complaints subscale. Clinical diagnostic impressions include Adjustment Disorder, Unspecified." <u>Id.</u>

Dr. Fenske concluded:

[Lewis] is experiencing impaired memory, trouble with executive functioning, verbal fluency issues, and cognitive fatigue. Results of this evaluation indicate that, relative to her previous level of functioning, Ms. Lewis is displaying significant deficits in working memory, processing speed, and initial verbal encoding. Mood is not a significant contributing factor to cognitive impairment.

AR2672. Dr. Fenske asserted that

mild traumatic [] brain injuries often do not show up on standard brain imaging tests because the tissue is not damaged in an obvious way. Post-concussion syndrome impacts the ability of neurons/brain cells to signal for the right amount of blood to accomplish certain processes but does not cause structural degradation to the cells themselves. Axonal injury is the shearing or tearing of the brain's nerve fibers/axons as the brain shifts and is rotated inside the bony surface of the skull, such as when the head is struck against another object. This type of injury is unable to be detected by traditional neuroimaging techniques, such as traditional CT or MRI. Symptoms of mild traumatic brain injury often emerge shortly after the injury and may persist for months or even years.

<u>Id.</u>

Dr. Fenske opined that "[g]iven her current level of cognitive impairment, Ms. Lewis is unable to return to the demanding and precise work of oncology nursing. With treatment, her functioning should improve, though returning to a profession where quick life-altering decisions need to be made on a daily

basis, is unlikely. She may be able to return to the nursing profession in some capacity that is not as fast paced." AR2672-73.

There is no documentation in the administrative record indicating that Lewis saw Dr. Fenske after the September 2020 neuropsychological evaluation.

> 19.  Dr. Thomas Berk

Dr. Balcer referred Lewis to Dr. Berk, a neurologist, whom plaintiff saw on November 30, 2020. See AR3871. Dr. Berk noted that Lewis presented

> with prolonged post-concussive symptoms and hypersensitivity which is limiting participation in life roles. She presents today to discuss options to try to reset symptom threshold and reduce frequency of exacerbation.
>
> ...
>
> The lengthy passage of time without substantive change in symptoms, as well as the primarily non-focal neurologic exam today, are reassuring that no acute process is occurring that warrants prompt evaluation. Further imaging therefore seems unlikely to change management at this time, though if the symptoms worsen, change in character, or do not respond appropriately to treatment, this decision could be revisited.
>
> Discussed recommendation for trial of cymbalta for reduction of symptoms and to reset threshold; patient declined at this time due to concern for side effects.
>
> Discussed initiation of GCRP inhibitors such as Emgality to try to break inflammatory cycle and reset the threshold; patient is interested in trying this medication.

AR3874.

Dr. Berk advised Lewis that for her to experience a "significant impact in symptom threshold may take several months particularly in setting of prolonged symptom history." Id. Lewis was advised to "[r]eturn in 4 weeks for follow-up." AR3875.

There is no indication in the administrative record that Lewis saw Dr. Berk for follow-up after November 30, 2020.

**F.  Unum's Medical Reviews and Decisions**

Unum engaged several consultants to conduct peer reviews of plaintiff's records.

### 1.  Unum's First Denial of Plaintiff's Claim

On March 8, 2018, plaintiff submitted a claim to Unum for LTD benefits. See AR2. To assess plaintiff's claim, Unum had three "board-certified physicians, one of whom is board certified in neurology, review[] [Lewis'] entire file, including all medical information back to 2014[.]" AR625.

#### a.  Ms. Shannon Pitula, RN

On April 5, 2018, Ms. Pitula completed a report for Unum. See AR484-87. Ms. Pitula concluded based on plaintiff's "reports and records of her injuries" that it is "medically inconsistent that her injury in 2014 and reported mild injuries to her head following this incident would cause severity of reported symptoms given ability to return to work for over 3 years." AR486. Ms. Pitula noted that a physician review "would be beneficial for additional analysis." AR487.

      *b.   Dr. Stephen Leverett, D.O.*

On May 1, 2018, Dr. Leverett, a specialist in family medicine, completed a Physician Review of Claim Data for Unum. See AR557-64. In additional to reviewing plaintiff's medical records, Dr. Leverett contacted Dr. Paul and Dr. Bender. See AR507-511.

Dr. Leverett spoke with Dr. Paul, and summarized their conversation in a letter. See AR510-11. Dr. Leverett's letter to Dr. Paul stated:

> You confirmed that you will continue to certify disability on the basis of some cognitive impairment as well as visual issues and headaches, and you do not think Coralisa Lewis can work with multitasking as an oncology nurse, or travel by train to get to her job; I noted some inconsistencies in the file with regard to description of the actual head injuries, mechanism of injuries[,] etc., and no brief cognitive assessment (such as Folstein, MoCA, etc.) to ascertain degree of cognitive impairment, if present; I asked regarding cognitive testing and you said Coralisa Lewis cannot tolerate it because of her symptom reports; however, you stated you will refer Coralisa Lewis for formal neuropsychological evaluation, and send behavioral optometry notes.

AR510.

Dr. Leverett expressed in a letter to Dr. Bender that in his medical opinion, "Lewis has had the functioning capacity to perform the occupational demands [of her job] on a full-time basis all along[,]" and that her "occupation does not require travel." AR542. On April 30, 2018, Dr. Bender responded, indicating that he did not agree that "Lewis had the functional

capacity to perform the occupational demands as outlined above on a full-time basis all along[.]" AR543. The sole "clinical rationale" Dr. Bender provided in support of that opinion was that Lewis' "occupation requires travel as she needs to commute from Fairfield County to NYC." Id.

Dr. Leverett "reviewed all medical and clinical evidence provided to me by company personnel bearing on the impairments for which I am by training and experience capable to assess." AR564. He concluded that "there is no condition or combination of conditions that would reasonably preclude [plaintiff] from being able to perform" the tasks required for her regular occupation. AR563. Dr. Leverett found that "Dr. Paul's and Dr. Bender's opinions are not well supported by medically acceptable clinical standards, laboratory or diagnostic techniques and are inconsistent with the other substantial evidence in the file." AR564.

c.   Dr. James Bress

On May 2, 2018, Dr. Bress, a specialist in internal medicine, completed a Physician Review of Claim Data for Unum. See AR569-70. Dr. Bress stated that he "completed a full review of the medical record," including the report by Dr. Leverett. AR569. Dr. Bress concluded:

> D[r.] Paul, D[r.] Dafcik and D[r.] Einbind[]er have all opined no work capacity [due to] post-concussion syndrome with [headaches], visual changes and cognitive

impairment. From a general medical standpoint there have
been no [restrictions and limitations] opined as
limiting. The limiting issues relate to her head injury
and neurological/cognitive problems. I therefore defer
an opinion as to [restrictions and limitations] to a
neurology DMO.

AR570.

### d.   Dr. Jacqueline Crawford

On May 11, 2018, Dr. Crawford, a specialist in neurology,

completed a Physician Review of Claim Data for Unum. See AR586-

88. Dr. Crawford "reviewed all medical and clinical evidence ...

for which [she was] by training and experience capable to

assess[]" including the medical records from Dr. Kunec, Dr.

Einbinder, Dr. Paul, Dr. Schulman, and Dr. Bender, and the

reports from GrayMatters. See AR586-88.

Dr. Crawford found that plaintiff's

ability to recall specific dates, events, and providers,
as is noted in Dr. Kunec's evaluation, is inconsistent
with the insured's report of memory difficulties.

The ImPact cognitive screening test performed by Dr.
Kunec is noted. However, as a screen, this test does not
include a robust assessment of effort and the extremely
low score in verbal memory and reaction time are
inconsistent with an individual who was able to provide
detailed history and able to drive.

AR587. Dr. Crawford also noted that plaintiff's

file does not contain evidence the insured was compliant
with Dr. Einbinder's order for a brain MRI. (10/24/17).
This lack of follow-through is inconsistent with an
individual seeking relief of an impairing degree of
cognitive impairment, dizziness, or headache.

Dr. Einbender's office reported the insured canceled her

50

MRI and did not return their calls. This lack of
communication is inconsistent with an individual seeking
relief of impairment.

Although Dr. Einbender is acknowledged as opining at the
initial visit that the insured was not able to work, in
subsequent communications, he did not offer support for
[restrictions and limitations].

Id. (sic).

Dr. Crawford reviewed the qEEG data from GrayMatters but

gave it little weight, stating that "QEEG's are not intended to

provide a diagnosis by themselves[]" and are "considered

experimental and investigational in the context of evaluation of

post-concussion syndrome[.]" Id.

Dr. Crawford reviewed the records of Dr. Schulman:

The optometry notes of optometrist Schulman are noted,
... and contain some inconsistencies.

- The 4/23/18 office visit documents a normal near point
  convergence at 2 inches, but then give Impression of
  "convergence insufficiency."

- The 5/4/18 letter of Dr. Schulman appears to recognize
  the normal convergence value but then offers a list
  of a variety of poor "skills" and "very restricted
  visual fields" despite prior documentation of normal
  visual fields on confrontation.

While constricted visual fields can occur in certain
serious ophthalmologic conditions, Dr. Schulman
documented that the insured's "Ocular health was
unremarkable."

Constricted visual fields are the most common pattern
demonstrated in non-physiologic visual complaints.

AR587-88 (sic).

Dr. Crawford stated that "[r]egardless of etiology, the

51

commentary of Dr. Bender that the insured is unable to drive long distances or ride on a train is noted." AR588. "However, neither driving long distance nor riding on a train are material and substantial duties" of plaintiff's ordinary employment. AR588 (sic).

> Dr. Crawford concluded:
>
> Cognitive impairment due to concussions not supported.
>
> Despite multiple reported incidents characterized as concussion, the file does not contain verifications by witness, accident report or physical evidence of head trauma.
>
> Even when considering the possibility of increased sensitivity due to prior history of trauma, the magnitude and duration of symptoms reported by the insured far-exceeds what would be anticipated from the mechanism of injuries described, none of which were accompanied by loss of consciousness or amnesia[.]

AR587.

On May 22, 2018, based on these medical reviews, Unum denied Lewis' claim for LTD benefits, stating that Unum had "determined you are able to perform the duties of your occupation. Because you are not disabled according to the policy, benefits are not payable." AR624.

### 2.   Plaintiff's Initial Appeal and Unum's Reversal

On November 17, 2018, plaintiff initiated an appeal of "the denial of long-term disability benefits" and "request[ed] an additional thirty days to provide further information regarding Ms. Lewis's psychological condition and treatment[.]" AR648.

Unum granted the request to submit additional evidence and
granted plaintiff an extension. See AR897. On December 17, 2018,
plaintiff submitted a letter and addendum supplementing the
November 17, 2018, appeal letter. See AR904-16.

On February 1, 2019, plaintiff was awarded SSDI benefits;
thereafter, plaintiff's counsel provided a copy of the SSDI
award and a letter to Unum. See AR982-89. Unum received "a
separate response from the SSA," indicating that Lewis' SSDI
Award was based on: "Primary diagnosis code 2940. This code is
defined by the SSA as Neurocognitive Disorders. Secondary
diagnosis code 2960. This code is defined by the SSA as
Depression, Bipolar and Related Disorders." AR1620.

On July 22, 2019, Unum informed plaintiff's counsel that it
had reversed its decision and awarded plaintiff LTD benefits.
See AR1602-07. The letter stated:

> We have determined on appeal that the information
> supports your client's behavioral health condition is in
> part due to mental illness. Disabilities due to mental
> illness have a limited pay period up to 24 months under
> the Unum policy. This 24-month period would run from
> February 26, 2018 through February 25, 2020.

AR1604.

### 3.   Unum's Review to Determine if the Mental Illness Limitation Applied

As Unum informed plaintiff when it began paying benefits,
the Plan provides that "[d]isabilities due to mental illness
have a limited pay period up to 24 months." AR2586. On June 5,

2020, Unum sent a letter to Lewis that stated:

> With the assistance of two of our physicians, one board certified in neurology, we have reviewed your complete file and have determined that you do not have a non-limited condition or combination of conditions that precludes your from performing the demands of your own occupation as performed in the national economy.

AR2584. Unum determined that plaintiff's claim was "subject to the mental illness limitation[.]" AR2585.

### a.   Dr. Stephen Leverett, D.O.

On May 28, 2020, Dr. Leverett, a specialist in family medicine, completed a second Physician Review of Claim Data for Unum. See AR2550-56. Dr. Leverett spoke with Dr. Paul and Dr. Schulman, and reviewed a letter from Dr. Hersh and medical records from Dr. Gutman, GrayMatters, Dr. Hersh, Dr. Paul, and Dr. Schulman. See generally id. Dr. Leverett determined that the opinions he reviewed were "not well supported by medically acceptable clinical standards, laboratory or diagnostic techniques and [were] inconsistent with the other substantial evidence in the file." AR2555.

> On May 18, 2020, Dr. Leverett and Dr. Schulman
>
> discussed [Lewis'] conditions including convergence insufficiency, light sensitivity, and confusion with sustained tasks; Dr. Schulman noted that the insured has trouble sustaining visual activities and would need extended breaks while working, but would be unable to sustain full-time work as an oncology nurse; stressors, such as a dog bite the insured sustained would contribute to exacerbating her underlying conditions[.]

AR2533. Dr. Leverett noted plaintiff's reports of "chronic

visual disturbance, [and] difficulty looking at monitors since
the 2014 closed head injury[,]" among other symptoms. AR2553.
Dr. Leverett observed that Dr. Schulman's March 4, 2019,
treatment record indicates that plaintiff's "convergence ranges
significantly improved, with reduced divergence recovery, an
assessment that is consistent with improvement in reported
visual deficiencies that alone or in combination with another
condition or conditions do not rise to a level of visual
impairment[.]" AR2553-54.

On May 18, 2020, Dr. Leverett summarized a telephone
discussion with Dr. Paul:

> You noted that you have seen Coralisa Lewis' condition
> deteriorate over the last 2 years, she is almost
> homebound, has difficulty driving, and is only able to
> engage in minimal screen time. You noted the etiology of
> her deterioration is unclear, although she does have a
> history of postconcussive syndrome, as well as the
> convergence insufficiency. ... You agree that there may
> be some behavioral health component to her clinical
> presentation but feel that Ms. Lewis may be in a rare
> subset of patients who paradoxically have severe
> symptoms following repeated, minor head injuries. I
> described to you that Ms. Lewis had failed 2 out of 4
> validity indices noted in the embedded criteria in the
> neuropsychological assessment performed in May and June
> 2018, findings worse than those seen in patients with
> early dementia, or severe TBI, or adults with impaired
> memory. Currently you do not feel Ms. Lewis would be
> able to sustain the occupational demands required for an
> oncology nurse.

AR2534. Dr. Leverett summarized Dr. Paul's findings as follows:

> Dr. Paul has assessed the Insured has an impairing brain
> injury and postconcussive syndrome; notably, if the qEEG
> was an accurate assessment of cognitive functioning as

> asserted, it is unclear why this testing was not serially
> repeated to determine clinical status over time or
> assess improvement, as a result of therapeutic
> interventions, or worsening, as a result of reported
> reinjuries or exacerbations[.]

AR2553.

Dr. Leverett noted that "[r]ecent attempts at obtaining new neuropsychological testing have been delayed reportedly due to a flare of symptoms from 'a recent concussion', with additional delays attributed to the coronavirus pandemic; and unsuccessful attempt at obtaining neurology IME." AR2552.

Dr. Leverett concluded that there was "sufficient medical information available to form an opinion on impairment[.]" AR2555. Dr. Leverett opined that plaintiff's "reports of functional impairment exceed the restrictions and/or limitations reasonably expected based on[]" plaintiff's history and reported symptoms. AR2553.

Dr. Leverett concluded:

> Based on a reasonable degree of medical certainty, and
> considering all conditions either alone or in aggregate,
> there is no non-behavioral health condition or
> combination of non-behavioral health conditions that
> would reasonably preclude the Insured from being able to
> perform [her work duties] ... without loss of efficiency
> or composure on a full-time sustainable basis as of
> 2/26/2020 and ongoing.
>
> ...
>
> The available information from the SSA is limited and
> does not contain diagnostic information or clinical
> assessments supportive of a neurocognitive disorder,
> i.e. an organic brain condition with associated

decreased cognitive functioning not attributable to a
behavioral health condition.

AR2555.

>            b.   *Dr. Edan Critchfield, Psy.D.*

On May 13, 2020, Dr. Critchfield, a specialist in

neuropsychology, completed a "Neuropsychology (NP) Consult

Response" based on a "review of the records provided, the

neuropsychological report [from Dr. Gutman], and the raw test

data[.]" AR3771.

Dr. Critchfield found that the neuropsychological testing

conducted by Dr. Gutman in May and June of 2018 indicated that

Lewis

> scored below expectation on the one and only stand-alone
> measure of performance validity administered, which
> indicates the scores from this evaluation cannot be
> relied upon to reflect an accurate depiction of the
> claimant's functioning. However, although possibly an
> underestimate of her functioning, the scores included in
> the claimant's report can be used to establish a minimum
> level of functioning.
>
> ...
>
> In sum, given the validity concerns, this evaluation
> cannot be relied upon to reflect a reliable and valid
> depiction of the claimant's functioning. Thus, this
> reviewer is of the opinion that this evaluation does not
> provide support for cognitive deficits that would result
> in functional impairment necessitating activity
> restrictions or limitations.

Id. Dr. Critchfield also noted that Lewis

> presented to her 2018 neuropsychological evaluation
> [with Dr. Gutman] with self-reports of anxiety and
> depression. Assessment of psychological symptom validity

via the MMPI2-RF raised concern for non-credible symptom
reporting. In specific, this measure indicated, "She
reported a much larger than average number of somatic
symptoms rarely described by individuals with genuine
medical conditions. She also provided an unusual
combination of responses that are associated with non-
credible reporting of somatic and/or cognitive symptoms.
In addition, she provided an unusual combination of
responses that are associated with non-credible memory
complaints."

Overall, given the validity concerns, this reviewer is
of the opinion that this neuropsychological evaluation
did not provide reliable and valid support for
psychological symptoms of the nature or severity to
result in functional impairment.

Id.

### c.   Dr. Vaughn Cohan

On June 1, 2020, Dr. Cohan, a specialist in neurology,
completed a Physician Review of Claim Data for Unum. See AR2560-
62. Dr. Cohan reviewed reports from Dr. Paul and Dr. Schulman,
"[n]eurologic examinations described in the medical records of
Drs. Toothaker, Sethi, and Einbinder[,]" and the qEEG reports.
AR2561. Dr. Cohan noted that the medical reports of Dr. Paul,
Dr. Toothaker, Dr. Sethi, and Dr. Einbinder all describe normal
exams except for problems with tandem gait. See AR2561. Dr.
Cohan stated that "a report from Dr. S[c]hulman dated March 4,
2019, indicates the claimant was found to be significantly
improved." Id.

Dr. Cohan found that plaintiff's

self-reported issues are excessive with respect to the
history reported. The claimant's self-reported issues

are excessive with respect to the nature and severity of the reported head injuries as described above. The claimant's self-reported issues are inconsistent with her reported current activities. The frequency of reported episodes of head trauma and the frequency of reported [motor vehicle accidents] are highly suggestive of a significant mental health etiology. Notwithstanding her issues, the claimant did continue to perform work requiring the use of a computer and continued maintenance of a valid nursing license through January 2020. Disability benefits were approved on a mental health basis initially, and it appears that behavioral health issues continue to predominate. It is noted that the claimant's mental health problems are chronic, and they became more prominent when her husband informed her that he was intending to file for divorce. The claimant has undergone a course of psychological counseling and cognitive behavioral therapy.

AR2562. Dr. Cohan opined "that the available information does not support a functional impairment (non-behavioral health-related) that would preclude the claimant from performing her above listed occupational demands on a full-time, sustained basis from February 26, 2020, ongoing. I am in agreement with the OSP opinion of Dr. Leverett." Id.

d. *Unum's Termination of Benefits*

On June 5, 2020, Unum sent Lewis a letter stating that Unum "will not be able to continue payment of [LTD] benefits[]" because Lewis had "reached the maximum duration for mental health conditions" and her claim was "subject to this limitation[.]" AR2582, 2583. The denial letter explained that Unum had

determined that you do not have a non-limited condition that precludes you from working in your occupation, and

> we have now provided 24 months of benefits, we will stop
> paying benefits on your claim.
>
> As you have received the maximum benefit for mental
> health conditions, we reviewed your file to determine
> whether a non-limited condition reasonably prevents you
> from performing the material and substantial demands of
> your regular occupation as performed in the national
> economy[.]

AR2583. Unum stopped paying benefits on Lewis' claim on June 5,

2020. See id.

### 4.   Lewis' Appeal and Unum's Decision to Uphold its Determination

On December 6, 2020, plaintiff initiated an appeal of

Unum's denial of her LTD benefits. See AR2890-909. Two

physicians completed reviews of plaintiff's file for Unum. See

generally AR4625-28. On February 11, 2021, relying on these

reviews, and the full record, Unum upheld its determination that

Lewis was "not disabled as defined under the policy." AR4634.

#### a.   Dr. Peter Brown

On January 14, 2021, Dr. Peter Brown, a specialist in

psychiatry, completed a Physician Review of Claim Data for Unum.

See AR4598. Dr. Peter Brown reviewed plaintiff's medical

records, Dr. Gutman's neuropsychological testing report, and Dr.

Fenske's neuropsychological evaluation report. See AR4598-99.

After summarizing the relevant medical evidence, Dr. Peter

Brown

> conclude[d] to a reasonable degree of medical certainty
> that:

Testing results do not support a diagnosis of malingering. However, neither do they demonstrate evidence of cognitive disorder due to a traumatic brain injury. A psychiatric explanation for the claimant's clinical condition has not been adequately addressed. As noted above, a probable psychiatric diagnosis was identified in mid 2018 but subsequent evaluation and treatment has been limited. The nature, severity, and duration of the claimant's symptoms have not been adequately explained by any general medical or neurologic diagnosis.

Depression is the most common cause of functional impairment world wide. The claimant's Neuropsychological testing results are similar to those found in patients with chronic mood disorders. Further, the most common symptoms in chronic mood disorders are persistent cognitive difficulties and fatigue, even in the absence of depressed mood, and is the case for claimant.

AR4598-99.

> b. *Dr. Cynthia Brown*

On January 26, 2021, Dr. Cynthia Brown, who is board certified in neurology, completed a Physician Review of Claim Data for Unum. See AR4612-18. Dr. Cynthia Brown reviewed the records of Dr. Balcer, Dr. Berk, Dr. Paul, Dr. Hersh, Dr. Rosner, Dr. Schulman, Dr. Dafcik, Dr. Rashbaum, Dr. Gottschalk, Dr. Einbinder, Dr. Toothaker, Dr. Sethi, Dr. Fenske, Dr. Gutman, and Dr. Kunec; Dr. Gutman's neuropsychological testing report; Dr. Kunec's neuropsychological testing report; and Dr. Fenske's neuropsychological evaluation report. See AR4612-16. Dr. Cynthia Brown conducted a detailed review of the "records, summaries and opinions that others have prepared," including Dr. Leverett's

reports, and also "performed [her] own independent analysis and formed [her] own conclusions." AR4613.

After reviewing plaintiff's history of reported injuries, Dr. Cynthia Brown opined that the "severe symptoms" reported by plaintiff were

> disproportionate to the actual events. The reported worsening of her symptoms in 2015 when her husband stated that he wanted a divorce is consistent with symptoms that are based on a behavioral health basis. Concussion symptoms typically improve with time; progressive worsening of symptoms is not expected in post-concussion syndrome. Post-concussion syndrome is a self-limited process that typically improves over weeks to months.

Id.

Dr. Cynthia Brown noted that plaintiff's ability to work "as an RN on a per diem basis since November 2018, [was] consistent with her ability to function cognitively as a nurse." Id. She also observed that Lewis "continues to drive which requires visual accuracy, quick eye movements and scanning, sustained visual focus and attention and quick judgments based on rapid executive decision-making." Id.

Dr. Cynthia Brown specifically noted Dr. Schulman's January 15, 2020, treatment record, which asserted that plaintiff "'is unable to sustain near visual tasks, particularly computer work for extended periods. She fatigues easily and after 10-15 minutes of near tasks, takes a long time to recover.'" AR4615. Dr. Cynthia Brown opined that Dr. Schulman's report was

> not consistent with the history that the insured is
> working part-time for 5 hours a day and trying to work
> 7 hours/day. It is also not consistent with the
> examination from Dr. S[c]hulman on 4/30/2019 indicating
> that the insured has 20/20 vision and break from
> convergence at 2", which is within normal limits.

Id. Dr. Cynthia Brown also commented on a letter by Dr.

Schulman dated June 22, 2020, noting that "some of these

descriptions are inconsistent as the insured had 20/20 both at

distance and near, thereby demonstrating that most of the other

functions are intact." Id.

Dr. Cynthia Brown reviewed plaintiff's qEEG reports.

However, she observed that the "American Academy of Neurology"

has concluded that "evidence of clinical usefulness or

consistency of results are not considered sufficient for us to

support" the use of qEEG testing "in diagnosis of patients with

postconcussion syndrome[.]" AR4616.[6]

Dr. Cynthia Brown reviewed the records of Dr. Balcer and

found that the "neuro-ophthalmology examination [was] basically

unremarkable, except for the convergence testing[,]" which was

"abnormal[.]" AR4613.

Dr. Cynthia Brown reviewed Dr. Hersh's July 30, 2020,

letter. See AR4614. Dr. Cynthia Brown found: "This letter does

---

[6] Dr. Cynthia Brown also questioned Dr. Paul's interpretations of
the qEEG reports, finding that those interpretations were, among
other concerns, "inconsistent with the clinical picture." AR4616.

not provide any new clinical information and provides [Dr.
Hersh's] opinion, which is not consistent with the opinions of
other providers" summarized in the Physician Review. AR4614.

Dr. Cynthia Brown reviewed Dr. Fenske's neuropsychological
testing report, observing that the report showed "inconsistent
results" and that plaintiff "had an elevation on the somatic
complaints subscale." AR4615.

Dr. Cynthia Brown reviewed Dr. Gutman's neuropsychological
evaluation report, highlighting the fact that Lewis had "failed
two of the four validity measures. Scores were highly variable
with preservation of verbal skills. Significant depression was
noted to be present. PTSD was also diagnosed." Id.

Dr. Cynthia Brown also reviewed the record of Dr. Berk,
which noted plaintiff's "[h]ypersensitivity to any small non-
concussive blow ... prolonged post-concussive symptoms and
hypersensitivity[.]" AR4613-14. Dr. Cynthia Brown found that
this "again confirm[ed] that the small everyday bumps and
bruises the insured is sustaining is resulting in a
hypersensitivity syndrome, not consistent with the natural
history and pathophysiology of concussion and post-concussion
syndrome." AR4617.

In sum, Dr. Cynthia Brown found that "the evidence in the
medical file does not support that the insured has sustained
significant head injuries and post-concussion syndrome following

the initial injury[.]" AR4616.

> Although the insured is reported to have had
> abnormalities found on examination by an optometrist,
> the examination by the neuro-ophthalmologist Dr. Balcer
> was unremarkable. The only finding was of convergence at
> 10 cm, and when the insured was scheduled for vision OT
> after that appointment, the goal for improvement was
> convergence below 15 cm, which she already had achieved.
> No other abnormalities of eye movements, including
> saccades, nystagmus or oculomotor dysfunction were noted
> by [Dr. Balcer].

AR4617.

Dr. Cynthia Brown observed that Dr. Schulman and Dr. Paul "noted symptom and functional improvement after February 2019 and during 2019 ... prior to the decrease in office visits due to the COVID-19 pandemic." AR4618. Dr. Cynthia Brown noted that Lewis sold "her house and move[d] during 2019, which require[d] planning, packing, [and] making judgments." Id. She found that Lewis

> has demonstrated her ability to work a seven hour day as
> a consultant, and therefore is cognitively intact in her
> ability to do so, consistent with the results of the
> neuropsychological testing. She is able to drive
> extended distances from Connecticut to Manhattan for
> work and appointments through the heavy traffic in the
> greater NY metropolitan area, consistent with her normal
> visual function documented by the neuro-ophthalmologist
> Dr. Balcer. The insured is able to care for herself and
> her apartment, consistent with the physical demands
> above.

AR4617-18.

Dr. Cynthia Brown concluded that the "sum of the evidence of the medical file does not support non-behavioral health

restrictions and limitations[.]" AR4613.

Unum upheld its determination that Lewis was "not disabled as defined under the policy." AR4634. On April 16, 2021, plaintiff filed the instant action. See Doc. #1.

## II.   STANDARD OF REVIEW

Where, as here, the "written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 82 (2d Cir. 2009) (citation and quotation marks omitted).[7]

Under the arbitrary and capricious standard the Court "may overturn an administrator's decision to deny ERISA benefits only

---

[7] The parties have stipulated "that the abuse of discretion standard of review applies in this case." Doc. #39. Notwithstanding that agreement, in their substantive briefing, each party later describes the standard of review as an arbitrary and capricious standard. See Doc. #35-1 at 6; Doc. #36-1 at 23. This is a distinction without difference. "In the context of an ERISA plan that grants discretion to the plan administrator, this more deferential standard of review is referred to interchangeably as either an 'abuse of discretion' standard or an 'arbitrary and capricious' standard." Wallace v. Grp. Long Term Disability Plan for Emps. of Tdameritrade Holding Corp., No. 19CV10574(ER), 2021 WL 1146282, at *8 (S.D.N.Y. Mar. 24, 2021), aff'd, No. 21-1019, 2022 WL 2207926 (2d Cir. June 21, 2022); see also Jeffrey Farkas, M.D., LLC v. Cigna Health & Life Ins. Co., 386 F. Supp. 3d 238, 243 (E.D.N.Y. 2019) ("Under an abuse of discretion standard, courts will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." (citation and quotation marks omitted)).

if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Hobson, 574 F.3d at 83 (citation and quotation marks omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Plitnick v. Fussell, 601 F. Supp. 2d 470, 478 (D. Conn. 2009) (citation and quotation marks omitted).

The scope of this Court's review is narrow, and it may not "substitute [its] judgment for that of the insurer as if [the Court] were considering the issue of eligibility anew." Hobson, 574 F.3d at 83-84 (citation and quotation marks omitted). Ultimately, "the question for this court is not whether [Unum] made the correct decision but whether [Unum] had a reasonable basis for the decision that it made." Id. at 89 (citation and quotation marks omitted).[8]

"It is an ERISA claimant's burden to establish an entitlement to benefits, and administrators may exercise their

---

[8] In Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), "the Supreme Court held that an ERISA-fund administrator that 'both evaluates claims for benefits and pays benefits claims' is conflicted, and that a district court, when reviewing the conflicted administrator's decisions, should weigh the conflict as a factor in its analysis." Durakovic v. Bldg. Serv. 32 BJ Pension Fund, 609 F.3d 133, 138 (2d Cir. 2010) (quoting Metro. Life Ins. Co., 554 U.S. at 112). The parties do not address this issue and the Court does not further consider it.

67

discretion in determining whether a claimant's evidence is sufficient to support his claim." <u>Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Benefit</u>, 621 F. App'x 70, 71-72 (2d Cir. 2015) (citation and quotation marks omitted).

For the reasons discussed below, the Court finds that Unum's determination that no further LTD benefits were payable to Lewis under the Plan is supported by substantial evidence.

### III. <u>CONCLUSIONS OF LAW</u>

Plaintiff raises only one issue on appeal: whether Lewis' "disability is 'due to mental illness' or due to her visual or cognitive impairments." Doc. #58 at 1.

#### A.  Unum's Consideration of the Medical Opinion Evidence was not Arbitrary and Capricious.

Plaintiff concedes that there is no "treating physician rule[]" in ERISA cases but argues that "there must be a rational basis stated by the insurer to reject [a treating provider's] opinion." Doc. #36-1 at 35 (citing <u>Glenn</u>, 554 U.S. at 118). Plaintiff argues that Unum failed to provide a rational basis to reject: (1) Dr. Schulman's and Dr. Balcer's opinions that Lewis is disabled by visual impairments and (2) Dr. Fenske's opinion that Lewis is cognitively disabled from performing her nursing occupation. <u>See</u> Doc. #36-1 at 31, 36. The Court considers each argument in turn.

    1.   <u>Substantial Evidence Supports Unum's Treatment of</u>
<u>Dr. Schulman's and Dr. Balcer's Visual Impairment</u>
<u>Opinions.</u>

At the outset, plaintiff contends that Unum failed to comply with the Department of Labor's ERISA Claim Regulations, and that, as a result, "the Court should ignore the opinions of Unum's employees and credit the opinions of the doctors who have demonstrated expertise with visual issues and concussions." Doc. #36-1 at 33. Specifically, plaintiff contends that Unum's "failure to have a file review conducted by a qualified medical professional is a violation of the Department of Labor's ERISA Claim Regulations" and the "Court should not permit Unum to rely on the opinions of physicians who do not meet the minimum requirements of the regulations." Doc. #36-1 at 32.[9] Unum contends that it did not violate the Claim Regulations because it "obtained peer reviews from two internists, three

---

[9] Plaintiff contends that "Unum never had the file reviewed by any optometrist or neuro-ophthalmologist, and Plaintiff has centered this case on her visual impairments throughout the pendency of this claim and in this litigation." Doc. #58 at 9-10. Plaintiff's contention that she has "<u>centered</u> this case on her visual impairments throughout the pendency" of the claim is belied by the record. <u>Id.</u> at 10 (emphasis added). Plaintiff's claim did not focus on her visual impairments until late in the process. <u>See</u>, e.g., AR648-57; AR904-16 (In plaintiff's 2018 appeal letter and supplemental appeal letter, only about one page in more than twenty is dedicated to the issue of her vision impairments.); AR2030-31 (During a phone call with an Unum representative on December 17, 2019, Lewis asserted that her two "biggest barriers from a normal life, [are] remarkably low reinjury [threshold], and her cognitive function.").

neurologists, a psychiatrist, and a neuropsychologist[,]" and
each of the three "reviewers who addressed visual impairment
issues" certified that he or she was "by training and experience
capable to assess[]" the evidence provided. Doc. #49 at 27
(citation to transcript omitted).

Plaintiff relies on 29 C.F.R. §2560.503-1(h)(3)(iii), which
provides:

> [I]n deciding an appeal of any adverse benefit
> determination that is based in whole or in part on a
> medical judgment, ... the appropriate named fiduciary
> shall consult with a health care professional who has
> appropriate training and experience in the field of
> medicine involved in the medical judgment[.]

29 C.F.R. §2560.503-1(h)(3)(iii) (2002) (effective Jan. 1, 2018,
to July 26, 2020).[10] For the reasons stated below, Unum did not
violate this regulation.

Although Unum "obtained peer reviews from two internists,
three neurologists, a psychiatrist, and a neuropsychologist[,]"
Doc. #49 at 27, plaintiff asserts that Unum was required to have
an optometrist or neuro-ophthalmologist review her file because
one of the disabilities she claimed related to her vision.
Courts, however, have "eschewed such a hyper-technical reading"
of 29 C.F.R. §2560.503-1(h). Young v. Hartford Life & Acc. Ins.

---

[10] Plaintiff filed her application on or about March 8, 2018. See
AR2. Accordingly, the Court cites to the regulation in effect at
that time. The language in this cited subsection has remained
consistent over the course of several amendments.

Co., No. 09CV09811(RJH), 2011 WL 4430859, at *12 (S.D.N.Y. Sept. 23, 2011) (citation and quotation marks omitted); see also Topalian v. Hartford Life Ins. Co., 945 F. Supp. 2d 294, 354 (E.D.N.Y. 2013) (collecting cases); Schnur v. CTC Commc'ns Corp. Grp. Disability Plan, No. 05CV03297(RJS), 2010 WL 1253481, at *16 (S.D.N.Y. Mar. 29, 2010) (finding "no requirement that [the insurer] engage physicians specially trained in the diagnosis of Lyme disease to examine Plaintiff or her records[]").

The Young decision is instructive. There, the court rejected a challenge to a peer reviewer's expertise where the plaintiff "provided no explanation as to why a neurologist whose primary field of expertise is pediatrics would offer a different opinion or not have sufficient expertise [in neck conditions and migraines] to evaluate her claim." Young, 2011 WL 4430859, at *12. Similarly here, although plaintiff challenges the expertise of the numerous peer reviewers, she has failed to establish that the physicians relied on by Unum lacked "appropriate training and experience" to assess the evidence of her visual impairment caused by head trauma. 29 C.F.R. §2560.503-1(h)(3)(iii).

Plaintiff's LTD claim includes reports of dizziness, nausea, headaches, fatigue, cognitive delays, memory issues, and vision problems, all of which Lewis contends stem from head injuries. Plaintiff's own appeal letter stated that she "claims disability from post-concussion syndrome based on a concussion

71

that occurred on July 3, 2014 and several subsequent small
concussions that caused vision and cognitive issues that
prevented her from performing her duties as a hospital nurse,
and have contributed to depression, anxiety and PTSD." AR648
(emphasis added). The Social Security Administration awarded
Lewis disability benefits based on the diagnoses of
"Neurocognitive Disorders[]" and "Depression, Bipolar and
Related Disorders." AR1620. On June 22, 2020, Dr. Schulman,
Lewis' optometrist, wrote a letter "recommend[ing] that [Lewis]
follow up with neurology[.]" AR2711.

Accordingly, Unum's decision to "obtain[] peer reviews from
two internists, three neurologists, a psychiatrist, and a
neuropsychologist[]" was not arbitrary and capricious, and
satisfies the requirements of 29 C.F.R. §2560.503-1(h)(3)(iii).
Doc. #49 at 27.

            a.   *Dr. Schulman's Opinion*

In response to a questionnaire, which appears to have been
provided by counsel for plaintiff, Dr. Schulman, a specialist in
optometry, reported that Lewis suffered from "Convergence
Insufficiency, Oculomotor Dysfunction including Saccadic
Dysfunction and Constricted Visual Fields[.]" AR676. Dr.
Schulman recommended that Lewis' computer monitor use should be
limited to "15-20 minutes at a time and up to 4 hours per

day[.]" AR677-78.[11] Dr. Schulman opined that "poor eye movements and reduced stereopsis[]" "would affect Ms. Lewis's ability to perform a position of a nurse[.]" AR677. Lewis argues that Unum failed to provide a rational basis for rejecting the opinion of Dr. Schulman, which plaintiff contends is supported by objective evidence. See Doc. #36-1 at 33-36.

     "Plan administrators[] ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). "However, plan administrators are not required 'to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'" Khesin v. Aetna Life Ins. Co., No. 3:20CV01361(SALM), 2022 WL 2834631, at *10 (D. Conn. July 20, 2022) (quoting Nord, 538 U.S. at 834). Indeed, "a plan need not accord the insured's treating physician greater deference than a plan's retained physician." Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 212 (2d Cir. 2006).

     Here, Dr. Crawford and Dr. Cynthia Brown, each of whom

_____

[11] Lewis agrees that her occupation was classified as "Office Nurse" which is "classified as a light duty occupation" requiring "occasional" computer and keyboard use, which is "up to one-third of a day." Doc. #36-1 at 3-4.

specializes in neurology, reviewed Dr. Schulman's records. Based
on these reviews, and the other evidence of record, it was not
arbitrary and capricious for Unum to reject Dr. Schulman's
opinion.

First, as observed by Dr. Crawford, Dr. Schulman's
treatment records "contain some inconsistencies." AR587. For
example, Dr. Crawford noted that on April 23, 2018, Dr. Schulman
documented "normal near point convergence at 2 inches" but in
the same record, listed "convergence insufficiency" in the
"Impression" section. Id. Dr. Cynthia Brown similarly found that
the descriptions in Dr. Schulman's treatment records were
"inconsistent as the insured had 20/20 both at distance and
near, thereby demonstrating that most of the other functions are
intact." AR4615.

Second, Dr. Crawford observed that Dr. Schulman's letter
dated May 4, 2018, was inconsistent with prior treatment
records; the letter "offers a list of a variety of poor 'skills'
and 'very restricted visual fields' despite prior documentation
of normal visual fields on confrontation." AR587 (quoting
AR573). Additionally, in her May 4, 2018, letter Dr. Schulman
asserted that plaintiff's "visual difficulties are a direct
result of her concussion and negatively impact her ability to
function and work during the day." AR573. Dr. Crawford opined
that "[w]hile constricted visual fields can occur in certain

serious ophthalmologic conditions, Dr. Schulman documented that the insured's 'Ocular health was unremarkable.'" AR587 (quoting AR573).

Third, the peer reviewers noted inconsistencies between Dr. Schulman's conclusions and records from other providers. Dr. Cynthia Brown observed that "[t]here [were] no oculomotor deficiencies noted by examiners[.]" AR4615. More specifically, Dr. Cynthia Brown noted that although Lewis

> is reported to have had abnormalities found on examination by [Dr. Schulman], the examination by the neuro-ophthalmologist Dr. Balcer was unremarkable. The only finding was of convergence at 10 cm, and when the insured was scheduled for vision OT after that appointment, the goal for improvement was convergence below 15 cm, which she already had achieved. No other abnormalities of eye movements, including saccades, nystagmus or oculomotor dysfunction were noted by the neuro-ophthalmologist.

AR4617.

Fourth, plaintiff's daily activities undermine Dr. Schulman's opinion. For instance, Dr. Schulman's assertion that plaintiff suffered from "restricted visual fields" was not "consistent with the insured being able to drive." AR4615. Dr. Cynthia Brown observed that Lewis "continues to drive which requires visual accuracy, quick eye movements and scanning, sustained visual focus and attention[.]" AR4613. Likewise, Dr. Schulman's contention that Lewis "is unable to sustain near visual tasks particularly computer work for extended periods[]"

"is not consistent with the history that the insured is working part-time for 5 hours a day and trying to work 7 hours/day." AR4615. And Dr. Crawford found that Lewis' return "to the vocational setting" for a period in late 2017 to early 2018 was "consistent with preserved vision and vestibular function sufficient to perform the activities of her occupation." AR587.

Finally, Dr. Schulman's opinion is inconsistent with that of Dr. Hersh, who stated in her letter of December 14, 2018, that "Coralisa can no longer function in her role as an oncology nurse because her PTSD symptoms have constricted her life so much that she ... cannot function in her previous capacity due to cognitive impairments, sensitivity to screens and a general lack of confidence in safely caring for patients." AR913 (emphasis added).

In sum, substantial evidence, including the opinions of Dr. Crawford and Dr. Cynthia Brown, supports Unum's rejection of Dr. Schulman's opinion. There is "nothing in the record indicat[ing] that [Unum] arbitrarily refused to credit [plaintiff's] medical evidence." Hobson, 574 F.3d at 90 (alterations added).

### b.  Dr. Balcer's Report

Dr. Balcer, a neuro-ophthalmologist, evaluated Lewis once, on September 8, 2020. See AR2730. Dr. Balcer stated: "For now, [Lewis] is disabled by her symptoms[.]" Id. Lewis construes this as a medical opinion, and contends that Unum failed to provide a

rational basis for rejecting it. See Doc. #36-1 at 31-32.
Plaintiff (perhaps understandably) focuses on this single,
unsupported statement, and effectively asks the Court to ignore
the remainder of Dr. Balcer's report.

The context of the full report does not suggest that the
statement that Lewis is "disabled by her symptoms" represents
the considered medical opinion of Dr. Balcer. AR2730. It might
just as reasonably be read as simply repeating Lewis' own
assertions, as they were made to Dr. Balcer. But even if the
statement constitutes a medical opinion, Unum was not required
to give such an opinion any special weight.[12]

"It is well settled that, in denying a claim for benefits
under ERISA, the plan administrator may rely on the opinion of
independent medical reviewers who have not conducted an
examination of the applicant, even where the reviewer's opinion
conflicts with that of the treating physicians." Tortora v. SBC

---

[12] Notably, Dr. Balcer was not a "treating physician" of Lewis;
she evaluated her only once, and never treated Lewis. See
AR2730. The rationale for giving increased weight to a treating
physician is that such a physician generally has "a greater
opportunity to know and observe the patient as an individual."
Nord, 538 U.S. at 832 (citation and quotation marks omitted).
Dr. Balcer had no such opportunity. Cf. Smith v. Comm'r of Soc.
Sec. Admin., 731 F. App'x 28, 31 (2d Cir. 2018) (Assignment of
little weight to physician's opinion was proper where physician
"saw [plaintiff] only four times[]" which was "unlikely to
provide an adequate basis for a thorough understanding of
[plaintiff's] conditions and limitations." (citation and
quotation marks omitted)).

<u>Commc'ns, Inc.</u>, 446 F. App'x 335, 338–39 (2d Cir. 2011)
(citation and quotation marks omitted). "[P]lan administrators
are <u>not</u> required 'to accord special weight to the opinions of a
claimant's physician; nor may courts impose on plan
administrators a discrete burden of explanation when they credit
reliable evidence that conflicts with a treating physician's
evaluation.'" <u>Khesin</u>, 2022 WL 2834631, at *10 (quoting <u>Nord</u>, 538
U.S. at 834).

Dr. Cynthia Brown, who is board-certified in neurology,
reviewed Dr. Balcer's records. <u>See</u> AR4612-13, AR4618. Based on
this review, and the other evidence of record, it was not
arbitrary and capricious for Unum to reject Dr. Balcer's opinion
that Lewis was disabled by visual issues.

Dr. Balcer's statement that Lewis was disabled was
inconsistent with her own clinical findings. Dr. Balcer
reported:

> Visual acuities were 20/20 in both eyes at distance.
> Visual fields were intact to confrontation. She
> perceived 10/10 Ishihara color plates correctly with
> each eye. Pupils were brisk to light without an afferent
> defect. Ocular ductions were full. Convergence near
> point was 10 cm; this is abnormal and above the 7 cm
> threshold. There was no nystagmus. Saccades and pursuits
> were normal on today's examination. Lids were symmetric.

AR3807. As Dr. Cynthia Brown correctly observed, Dr. Balcer's
examination of Lewis was "basically unremarkable, except for the

convergence testing."[13] AR4613.

Dr. Balcer did not state <u>which</u> symptoms could have rendered Lewis disabled. The only abnormal result found by Dr. Balcer at the September 8, 2020, visit was that Lewis' "[c]onvergence near point was 10 cm; this is abnormal and above the 7 cm threshold." AR3807. This must, logically, be what rendered Lewis disabled, if in fact she was disabled, because it is the only abnormal result reported.

But other records suggest that this near-point convergence abnormality would not have been disabling, without more. After the evaluation, Dr. Balcer referred Lewis to vision occupational therapy. <u>See</u> AR2730, 2731. The record of Lewis' first occupational therapy appointment on October 1, 2020, states that Lewis' long-term goal is to "improve convergence to fall at or less than 15 cm to improve visual endurance for near work by discharge." AR2737. Plaintiff was already <u>within</u> the goal range for convergence, at 10 cm, at the time of Dr. Balcer's examination of plaintiff.

---

[13] Plaintiff contends that "Dr. Balcer erroneously stated in her summary that Ms. Lewis's saccades were normal (AR 2730), but the abnormal saccades test is clearly stated in the medical records (AR 2734)[.]" Doc. #36-1 at 32. The page of the Administrative Record plaintiff cites to for the abnormal saccades test is a record from a different provider; the banner at the top of the page states "Treatment Summary by Elizabeth Martori, OT at 10/1/2020[.]" AR2734. There is no reason to believe that Dr. Balcer's report does not accurately report Dr. Balcer's own findings.

Plaintiff's daily activities also undermine Dr. Balcer's statement that Lewis was disabled by her symptoms. As Dr. Cynthia Brown observed, plaintiff's activities such as "driv[ing] extended distances" were "consistent with her normal visual function documented by the neuro-ophthalmologist Dr. Balcer[]" but <u>inconsistent</u> with any finding that Lewis is disabled by her symptoms. AR4618.

In sum: Dr. Balcer is not a treating physician. It is not clear whether her statement that plaintiff was "disabled by her symptoms" constituted a medical opinion or a documentation of plaintiff's self-report. Dr. Balcer's examination revealed only one abnormal result, and even that result was within the target range.

Substantial evidence supports Unum's decision not to give weight to this portion of Dr. Balcer's report. "[T]he fact that [plaintiff's] treating physicians disagreed with the physicians that [Unum] retained does not, without more, make the decision to deny benefits arbitrary and capricious." <u>DeCesare v. Aetna Life Ins. Co.</u>, 95 F. Supp. 3d 458, 488 (S.D.N.Y. 2015) (alterations added).

2.  <u>Substantial Evidence Supports Unum's Rejection of Dr. Fenske's Cognitive Impairment Opinion.</u>

Lewis argues that Unum "failed to provide a rational basis to reject Dr. Fenske's opinion that Ms. Lewis is cognitively

disabled from her nursing occupation." Doc. #36-1 at 36
(capitalization altered). Lewis underwent a neuropsychological
evaluation with Dr. Fenske over the course of two days, on
September 1, 2020, and September 3, 2020. See AR2668-73. Dr.
Fenske concluded that Lewis displayed "significant deficits in
working memory, processing speed, and initial verbal encoding.
Mood is not a significant contributing factor to cognitive
impairment." AR2672. Dr. Fenske opined that given plaintiff's
"current level of cognitive impairment, Ms. Lewis is unable to
return to the demanding and precise work of oncology nursing."
Id.

Dr. Fenske's records were reviewed by Dr. Cynthia Brown, a
specialist in neurology, and by Dr. Peter Brown, a specialist in
psychiatry. See AR4615, AR4598. Based on these reviews, and the
other evidence of record, it was not arbitrary and capricious
for Unum to reject Dr. Fenske's opinion.

The record does not support plaintiff's contention that
Unum "rejected Dr. Fenske's neuropsychological findings without
good reason." Doc. #58 at 14. To the contrary, "there is no
evidence that [Unum's] independent experts refused to consider
the results of [Lewis'] in-person examinations or ignored h[er]
treating physicians." Hafford v. Aetna Life Ins. Co., No.
16CV04425(VEC), 2017 WL 4083580, at *8 (S.D.N.Y. Sept. 13,
2017).

81

First, Dr. Peter Brown found that the clinical examination results reported by Dr. Fenske did not support Dr. Fenske's conclusion. Dr. Peter Brown

> conclude[d] to a reasonable degree of medical certainty that:
>
> Testing results do not support a diagnosis of malingering. However, neither do they demonstrate evidence of cognitive disorder due to a traumatic brain injury. A psychiatric explanation for the claimant's clinical condition has not been adequately addressed. ... The claimant's Neuropsychological testing results are similar to those found in patients with chronic mood disorders. Further, the most common symptoms in chronic mood disorder are persistent cognitive difficulties and fatigue, even in the absence of depressed mood, as is the case for the claimant.

AR4598-99.

Second, both reviewing physicians noted significant inconsistencies in the record, and in Dr. Fenske's own testing, that Dr. Fenske failed to address in her opinion. Dr. Cynthia Brown observed "inconsistent results on auditory word learning with the insured perform[ing] better on delayed recall than on immediate recall." AR4615. Dr. Peter Brown noted that "[t]he level of variability in the testing results was not addressed. Results were not compared to the previous neuropsychological testing." AR4598.

Third, plaintiff's daily activities and abilities undermine Dr. Fenske's opinion. Lewis does not dispute that she "has been working as a per diem nursing consultant[.]" AR4617. Plaintiff

"demonstrated her ability to work a seven hour day as a consultant," and was "able to sell her house and move during 2019, which requires planning, packing, [and] making judgments." AR4617, 4618. These activities are inconsistent with Dr. Fenske's opinion that plaintiff is disabled from working as a nurse due to "significant deficits in working memory, processing speed, and initial verbal encoding." AR2672.[14]

In sum, substantial evidence supports Unum's rejection of Dr. Fenske's opinion. Unum's reviewers disagreed with Dr. Fenske. "This disagreement, however, does not render [Unum's] denial of benefits erroneous as a matter of law or otherwise arbitrary and capricious." Kocsis v. Standard Ins. Co., 142 F. Supp. 2d 241, 253 (D. Conn. 2001). There is "nothing in the record indicat[ing] that [Unum] arbitrarily refused to credit [plaintiff's] medical evidence." Hobson, 574 F.3d at 90 (alterations added).

**B.    Unum's Conclusion that Lewis Does Not Have a "Non-Limited" Disability Under the Terms of the LTD Plan Was Not Arbitrary and Capricious.**

As previously explained, under the arbitrary and capricious standard, the Court "may overturn an administrator's decision to

---

[14] Dr. Fenske evaluated Lewis in September 2020. In her review, Dr. Cynthia Brown observed that "Dr[]. Schulman and Dr. Paul had also noted symptom and functional improvement after February 2019 and during 2019[.]" AR4618. Dr. Fenske's failure to acknowledge this improvement that had been noted by Lewis' own primary treating physicians further undermines her opinion.

deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." Hobson, 574 F.3d at 83. "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." Plitnick, 601 F. Supp. 2d at 478 (citation and quotation marks omitted). If the "administrator has cited 'substantial evidence' in support of its conclusion, the mere fact of conflicting evidence does not render the administrator's conclusion arbitrary and capricious." Roganti v. Metro. Life Ins. Co., 786 F.3d 201, 212 (2d Cir. 2015).

In other words, the question for the Court is not whether Unum made the correct decision, or even whether this Court would make the same decision on a blank slate. Rather, the question is whether substantial evidence supports Unum's conclusion that Lewis does not have a non-limited disability under the Plan. See Hobson, 574 F.3d at 89; see also Kocsis, 142 F. Supp. 2d at 253 ("Regardless of how another reasonable mind might have arrived at a decision on the plaintiff's eligibility for disability benefits ..., the court is not free to substitute its own judgment, or that of other medical professionals, for that of Standard, as the Plan's administrator, as if the court were considering the plaintiff's eligibility anew.").

Plaintiff argues that "Unum's decision that [she] suffered from a mental illness is arbitrary and capricious because Unum did not adequately" consider that she had "visual disabilities[]" or "suffered significant cognitive deficits that disabled her[.]" Doc. #36-1 at 24, 36. The Administrative Record in this case covers more than five years and 4,500 pages. See generally AR1-4643. There are some records that might support plaintiff's contention that she is disabled from a non-limited condition. But there is also substantial evidence supporting Unum's conclusion that Lewis is disabled by a mental illness, which is limited by the Plan.

The record is replete with reports that plaintiff struggled with mental health issues. For example, in 2014, plaintiff reported to Dr. Toothaker that she had "been feeling depressed lately." AR332. In 2015, plaintiff reported to Dr. Gottschalk that when her husband asked for a divorce, plaintiff experienced a "significant worsening of symptoms[.]" AR399. In 2017, plaintiff reported to Dr. Einbinder that plaintiff "is suicidal when symptoms are bad as she has no quality of life." AR124. In July 2018, plaintiff complained of "anxiety" to Dr. Paul, who thereafter recommended that plaintiff "follow up with Dr. Mindy Hersch for continue cognitive behavioral therapy[.]" AR703-04 (sic). In December 2018, Dr. Hersh wrote: "Aside from the physical difficulties [Lewis] experiences, I feel comfortable

substantiating her disability claim based on her <u>psychological</u>

symptoms." AR911 (emphasis added); <u>see also</u> AR913 ("Coralisa can

no longer function in her role as an oncology nurse because her

PTSD symptoms have constricted her life so much[.]").[15] In 2019

during an appointment with Dr. Paul, plaintiff "occasionally

mention[ed] suicid[e] as an option in the future[,]" but did

"not want to pursue taking antidepressants." AR2702. In

September 2020, Dr. Balcer noted that Lewis had "not been

evaluated for the persistent symptoms of anxiety and

neuropsychological sequelae." AR2727.

Indeed, Dr. Peter Brown, a psychiatrist, opined that Lewis'

test results were "similar to those found in patients with

chronic mood disorders. Further, the most common symptoms in

chronic mood disorder are persistent cognitive difficulties and

fatigue, even in the absence of depressed mood[.]" AR4599.

Even if Lewis is correct that the record <u>could</u> reasonably

be read to support a finding of disability based on visual or

cognitive impairments, Unum's weighing of the evidence did not

fall "so far outside the range of its discretion as to

constitute arbitrary and capricious decisionmaking that was

---

[15] On July 30, 2020, Dr. Hersh wrote: "It is my opinion that
Coralisa's disability is not due to a psychological condition.
While it is true that Coralisa has many depressive symptoms,
these do not fit with any organic mood disorder." AR2656. Dr.
Hersh offers no explanation for the conflict between this
opinion and her December 2018 report.

without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Todd v. AETNA Health Plans</u>, 31 F. App'x 13, 14 (2d Cir. 2002) (citation and quotation marks omitted). The mere fact that the administrative record contains "conflicting evidence does not render the administrator's conclusion arbitrary and capricious." <u>Roganti</u>, 786 F.3d at 212.

In sum, and in light of the deferential standard of review, the Court finds that substantial evidence, including peer review opinions and thousands of pages of medical records, supports Unum's decision. The Court finds that Unum's determination that Lewis is no longer eligible for benefits under the Plan because she does not suffer from a "non-limited condition" was not arbitrary and capricious. AR2585.

## IV.   <u>CONCLUSION</u>

For the reasons stated, Unum's determination is supported by substantial evidence, and the determination that Lewis is no longer eligible for benefits under the Plan was not arbitrary and capricious. Accordingly, the Court **AFFIRMS** the administrative decision of Unum to terminate plaintiff's LTD benefits.

Judgment shall enter in favor of Unum. The Clerk of the Court shall close this case.

It is so ordered at Bridgeport, Connecticut, this 29th day of March, 2023.

                                   /s/
                                 _____
                                 HON. SARAH A. L. MERRIAM
                                 UNITED STATES CIRCUIT JUDGE
                                 Sitting by Designation